# FOURTH STREET BANK (*of Philadelphia*) *v.* YARDLEY.

**CERTIFICATE FROM THE COURT OF APPEALS FOR THE THIRD CIRCUIT.**

No. 147. Argued January 12, 13, 1897. — Decided March 1, 1897.

As between a check holder and the bank upon which such check is drawn, it is settled that, unless the check be accepted by the bank, an action cannot be maintained by the holder against the bank.

It is also settled that a check, drawn in the ordinary form, does not, as between the maker and payee, constitute an equitable assignment *pro tanto* of an indebtedness owing by the bank upon which the check has been drawn, and that the mere giving and receipt of the check does not entitle the holder to priority over general creditors in a fund received from such bank by an assignee under a general assignment made by the debtor for the benefit of his creditors.

That the owner of a chose in action or of property in the custody of another may assign a part of such rights, and that an assignment of this nature, if made, will be enforced in equity, is also settled doctrine of this court.

The Keystone Bank, through its president, solicited the Fourth Street Bank to give to the former $25,000 of gold certificates, for which the Keystone Bank was to give its check against its reserve account in the Tradesmen's National Bank of New York City. At the same time that this request was made the president of the Keystone Bank made the further statement that his bank owed a balance at the clearing-house which it could not meet "because its funds were in the city of New York," and exhibited a memorandum showing the amount to its credit with the Tradesmen's Bank to be in the neighborhood of $27,000. In reliance upon such representations and the statements made supported by the memorandum exhibited, the Fourth Street Bank delivered to the Keystone Bank the certificates requested, and there was delivered a check for $25,000 upon the Tradesmen's National Bank of New York. The draft in question was at once forwarded to the city of New York, and was presented for payment at the Tradesmen's Bank on the following morning, when payment was refused. At the time of presentment the Tradesmen's Bank had to the credit of the Keystone Bank $19,725.62 in cash and collection items amounting to $7181.70, in all $26,907.32. Of this amount $18,056.21 had been remitted by the Keystone Bank on the day previous. *Held*,

(1) That, it being established that it was the intention and agreement of the parties to the transaction that the check drawn generally should be paid out of a particular fund, such check, as between the parties, is to be treated as though an order for payment out of the specific, designated fund;

(2) That as the Fourth Street Bank contracted and parted with its money on the faith of the representations of the Keystone Bank that there was to its credit, in the Tradesmen's Bank, a specific sum, and the fund which came into the hands of its voluntary assignee was the fund as to which the representations were made, the Keystone Bank and its assignee were in equity estopped from asserting, to the prejudice of the Fourth Street Bank, that the character and condition of the fund was otherwise than it was represented to be.

By a bill filed in the Circuit Court of the United States for the Eastern District of Pennsylvania, appellant sought to sub-

ject moneys in the hands of the receiver of the Keystone
National Bank to the satisfaction of an alleged equitable
charge or lien thereon.    From a decree dismissing the bill
an appeal was taken to the Circuit Court of Appeals for the
Third Circuit.    The latter court thereafter certified to this
court two questions of law arising upon the facts stated,
which facts are set out in the margin hereof.[1]

---

[1] On the 19th day of March, 1891, the said Fourth Street National Bank
advanced twenty-five thousand dollars ($25,000) in clearing-house gold cer-
tificates to the said Keystone National Bank to enable it to meet its debtor
balance in the Philadelphia clearing-house under these circumstances.    On
said date Gideon W. Marsh, the president of the Keystone National Bank,
acting on its behalf and by its authority, came to the banking room of the
said Fourth Street National Bank, in the city of Philadelphia, and there
represented to the officials of that bank that the Keystone National Bank
owed a balance at the clearing-house which it could not meet, because its
funds were in the city of New York, and exhibited to them a memorandum
showing a balance to the credit of the Keystone National Bank in the Trades-
men's National Bank of the city of New York of about twenty-seven thou-
sand dollars ($27,000), stating that his bank wished to draw against it and
get clearing-house certificates; and he asked the Fourth Street National
Bank to accept the draft of the Keystone National Bank for twenty-five
thousand dollars ($25,000) against this " reserve account in the New York
bank " — that is to say, against the said fund in the Tradesmen's National
Bank — and give his bank clearing-house gold certificates therefor.    Rely-
ing upon these representations of Marsh, and on the faith of his statement,
supported by the said memorandum, that the Keystone National Bank had
in the Tradesmen's National Bank the specified fund against which it pro-
posed to draw, the Fourth Street National Bank gave Marsh, for the use of
the Keystone National Bank, clearing-house gold certificates to the amount
of twenty-five thousand dollars ($25,000) and took its draft, of which the
following is a copy:

　　　　　　　　　　　　　　" Keystone National Bank.　　　　No. 5086.
　　　　　　　　　　　　　　　" PHILADELPHIA, *March* 19, 1891.
    " Pay to the order of R. H. Rushton, cashier, ($25,000) twenty-five thou-
sand dollars.
　　　　　　　　　　　　　　　　　　" JOHN HAYES, *Cashier.*
    " To the Tradesmen's National Bank, New York."

    R. H. Rushton was the cashier of the Fourth Street National Bank.
    The books of the Keystone National Bank show that on the 19th day of
March, 1891, it had to its credit in the Tradesmen's National Bank of the
city of New York the sum of twenty-six thousand nine hundred and seven
and $\frac{32}{100}$ dollars ($26,907.32), and on the same day an entry was made therein

The following are the questions propounded :

"First.  Do the above stated facts show an equitable assignment by the Keystone National Bank to the Fourth Street National Bank of twenty-five thousand dollars of the fund, consisting of cash and collection items or drafts as aforesaid, belonging to the Keystone National Bank in the hands of the Tradesmen's National Bank?

"Second.  If the stated facts do not show such equitable assignment of the whole twenty-five thousand dollars, do they show such equitable assignment of the cash so in the hands of the Tradesmen's National Bank, namely, the sum of nineteen thousand seven hundred and twenty-five and $\frac{62}{100}$ dollars?"

*Mr. Samuel Dickson* and *Mr. Richard C. Dale* for appellant.

---

charging against that credit the said draft for twenty-five thousand dollars ($25,000) it had given to the Fourth Street National Bank.

The draft for twenty-five thousand dollars ($25,000) was duly forwarded to New York for collection and was presented for payment to the Tradesmen's National Bank on the morning of March 20, 1891.  Payment thereof was refused upon the ground that the drawee had not in hand funds of the drawer sufficient to pay the same.  In fact, the Tradesmen's National Bank had in cash and in collection items (drafts) for the Keystone National Bank the sum of twenty-six thousand nine hundred and seven and $\frac{32}{100}$ dollars ($26,907.32), of which eighteen thousand and fifty-six and $\frac{21}{100}$ dollars ($18,056.21) were remitted by the latter-named bank to the former on March 19, 1891, and the rest previously.  The Tradesmen's National Bank then had in hand in cash to the credit of the Keystone National Bank the sum of nineteen thousand seven hundred and twenty-five and $\frac{62}{100}$ dollars ($19,725.62), and had in addition the said collection items to make up the full sum of twenty-six thousand nine hundred and seven and $\frac{32}{100}$ dollars ($26,907.32).  Afterwards this money was paid and the said collection items or drafts were turned over to Robert M. Yardley, the receiver of the Keystone National Bank, and out of the collection items he realized sixty-one hundred dollars ($6100), and he thus had in his hands from this source when the bill in this case was filed the sum of twenty-five thousand eight hundred and twenty-five and $\frac{62}{100}$ dollars ($25,825.62) in cash.

On the 20th day of March, 1891 (some time during the morning), by the order of the Comptroller of the Currency of the United States, the Keystone National Bank was closed, and thereafter Robert M. Yardley was appointed receiver thereof.

*Mr. Silas W. Pettit* for appellee.

I. The paper given by the Keystone to the Fourth Street Bank was a check in ordinary form on the Tradesmen's Bank for $25,000, and was represented by Marsh to be drawn against the balances which he alleged the Keystone had with the Tradesmen's Bank upon a deposit account such as banks usually keep between themselves. Under the Banking Act Philadelphia national banks can count as part of their reserve against the amount of their notes in circulation and deposits the amounts they have to their credit with New York national banks. Rev. Stat. §§ 5191, 5195.

So far, therefore, the check in question is the same as any check drawn by any depositor upon a bank in which he has a deposit account.

Although many respectable authorities, such as Chancellor Kent, Mr. Byles and Mr. Morse, have held that the holder of a check drawn against sufficient funds has a right of action against the drawee, the weight of authority is the other way. *Saylor* v. *Bushong,* 100 Penn. St. 23, 27; *Bank of Republic* v. *Millard,* 10 Wall. 152, 157; *Florence Mining Co.* v. *Brown,* 124 U. S. 385. Mr. Morse himself, although strongly arguing the other way, concedes that "the most numerous body of decisions sustains the view that a check is neither a legal or an *equitable assignment as between drawer and payee,* nor a sufficient foundation for *any action* by a holder against the bank." Morse on Banks, § 493.

A check is clearly not an assignment of money in the hands of a banker; it is a bill of exchange payable at a banker's. The banker is bound by his contract with his customer to honor the check when he has sufficient assets in his hands; if he does not fulfil his contract he is liable to an action by the drawer, in which heavy damages may be recovered if the drawer's credit has been injured. I do not understand the expressions attributed to Mr. Justice Byles in the case of *Keene* v. *Beard,* but I am quite sure that learned judge never meant to lay down that a banker who dishonors a check is liable to a suit in equity by the holder. *Hopkinson* v. *Forster,* L. R. 19

Eq. 74. See also *First National Bank* v. *Whitman*, 94 U. S. 343; *Laclede Bank* v. *Schuler*, 120 U. S. 511; *St. Louis & San Francisco Railroad* v. *Johnston*, 133 U. S. 566, 574.

Bills of exchange and checks do not stand on the footing of orders drawn upon a particular fund with a manifested intention to create a lien thereupon, and the tendency and preponderancy of authorities seem in favor of the rule that neither a bill of exchange nor a check on a bank can operate as an assignment or appointment of the fund in the drawee's hands, or create any manner of lien upon it. *Dana* v. *Third National Bank*, 13 Allen, 445–448. As this case arises between a Pennsylvania and a New York bank, it may not be out of place to note that the rule of this court has been fully adopted by the courts of both those States. *Saylor* v. *Bushong*, 100 Penn. St. 23; *First National Bank* v. *McMichael*, 106 Penn. St. 460; *Ætna Bank* v. *Fourth National Bank*, 46 N. Y. 82; *People* v. *Merchants' Bank*, 78 N. Y. 269; *Risley* v. *Phœnix Bank*, 83 N. Y. 318.

It is to be remembered, however, that in many of the States the rule is that the giving of a check does in law operate as an equitable assignment *pro tanto* of the fund against which it is drawn. This is (or formerly was) the law in Missouri (see *First National Bank* v. *Coates*, 3 McCrary, 9), and hence it is contended that the cases of checks on banks cited by appellant are not in point here because governed by the law then prevailing in that forum.

No doubt no writing, and no particular form of words written or verbal, is needed to constitute a valid assignment in equity of a debt or other chose in action; any expression, written or verbal, is sufficient which shows the intention to transfer or appropriate a particular debt or fund to the assignee for a valuable consideration, and this is true likewise of most forms of personal property.

That ordinarily a check drawn in the usual course of business upon a deposit in a bank would operate as such an assignment is quite clear from the reasoning of the cases in those States which hold it to be such, but for reasons of commercial convenience too well established to need to be stated or

defended it has been thoroughly established by this court and
in the courts of many of the United States, that where the
depositor is a bank or banker a check or bill of exchange
drawn on it or him is not an equitable assignment in favor of
the payee of the check.

A check drawn generally is not considered to be drawn on
a particular fund, and, except in those States in which it is
considered to be an equitable assignment of the amount men-
tioned therein, the legal right of the drawee of the check to
countermand it and forbid its payment, or to forestall it by
drawing other checks and having them presented, is well estab-
lished, and however dishonorable and fraudulent the drawer's
conduct may be, it is confidently believed that in no case has
a holder of the check been permitted to recover, either at law
or in equity, against the drawee, except in those States in
which he has a right of action against the drawee upon the
check itself, irrespective of any other circumstance. On the
contrary, the general practice has been, as shown by the re-
ports, for the payee of the check to attach the funds in the
hands of the drawee as the property of the drawer of the
check, a method of procedure clearly inapplicable if the giving
of the check operated as an assignment.

On the other hand, if the check does operate as an assign-
ment as between the drawee and the payee, even if it did not
do so as against the bank or banker on whom it is drawn, it is
clear that upon presentation and notice to the drawee, the
right of action by the payee against the drawee would accrue,
and that such action does not accrue is the exact point de-
cided by numerous cases in the Supreme Court of the United
States, which have been followed by the courts of many other
States, including those of Pennsylvania and New York, where
the transaction now in controversy took place.

On the one hand, it is held that where the check is drawn
against funds in a bank, of course that particular fund is
the fund designated in the check, and that the holder of the
fund is under an implied promise, arising from the well-known
usage of the business, to pay the check upon demand — that
the banker when he receives the deposit agrees with the deposi-

tor to pay it out on the presentation of his checks in such sums as those checks may call for, and to the person presenting them, and agrees with the whole world that the owner of such check shall, upon presentation, thereby become the owner and entitled to receive the amount called for by the check, provided the drawer shall have funds on deposit to meet it, and that there thus arises a privity of contract upon which the holder of the check may at once sue the banker in case it is dishonored. On the other hand, however, it is held that there is no privity of contract between the banker and holder of the check when it is given; that, obviously, the check is given and accepted on the credit of the drawer alone, and not on that of the drawee, and that the payee, or owner of the check, has no rights against the bank holding the deposit until presentment and acceptance, and that otherwise great inconvenience would arise in the conduct of the business of banking:

Except for the inconveniences, the first rule would seem to be the logical one, and has in fact been frequently applied by all the courts where a check, or an order equivalent thereto, is given upon an agent or consignee or other depositary of money or property belonging to him who gives the check or other order to pay, transfer or deliver the money or property designated therein, as the cases cited by the appellant abundantly establish. The difficulty of the appellants, is not from the want of analogy between the cases they cite and the appeal they prosecute here, but arises because of the rule already referred to, now thoroughly established as law by the decisions of this court and adopted by most of the States in accordance with those decisions; whatever may be the rule governing equitable assignments of money or property in general, it is now held that a check on a banker is not an assignment of the fund on which it is drawn.

II. Nor was there in this case any special circumstance which would take it out of the general rule.

The representation by Marsh that the check was drawn against funds was only the verbal expression of that which is necessarily implied by the giving of the check itself, an im-

plication so strong that it has been held that the drawer of a check drawn on a bank where he has no funds is liable, criminally, for a false pretence; and the cases are numerous where the vendor of merchandise has been permitted to rescind· the sale on the ground of fraud when he has made delivery upon the faith of a check drawn against a bank in which the drawer had not sufficient funds to meet it.

Nor does it seem that the fact that the check was entered by the Keystone Bank in its account against the Tradesmen's Bank should affect the question. Such entry would almost certainly be found in every case where a check is drawn, and in no case could it have less weight than in the one under consideration, because in this case the bank did not, as matter of fact, have the balance in the Tradesmen's Bank which its books pretended it had, and such check was in fact an overdraft when made.

III. The point that the receiver has no rights other than those of the Keystone Bank does not seem to affect the question here.

By Rev. Stat. section 5242, all transfers by national banks of deposits to its credit, for its use "or for the use of any of its shareholders or creditors; and all payments of money to either made after the commission of an act of insolvency, or in contemplation thereof," are declared to be utterly null and void. The Keystone Bank was closed on March 20, 1891, and thereafter any payment on a check theretofore drawn by it was prohibited by law, and the receiver, representing all its creditors, was entitled to all sums on deposit to its credit at the time the bank was closed, for equal distribution among them. The same rule is of familiar application in practice in other cases of insolvency, and it is believed that no case can be found, except, perhaps, some where the circumstances were extraordinary, in which the holders of any unpresented check have been held to be entitled to the bank balances standing to the credit of the insolvent at the time of the insolvency as against the assignee; certainly the every-day practice is for the assignee to take over all the bank balances of the assignor in preference to the holders of unpresented checks, who come

in only for their dividend thereon out of the general fund. And that this is the usual practice is again shown by the numerous cases in which the right of stoppage *in transitu* has been exercised by the holders of such checks upon the ground of the failure of the consideration for which they had sold their merchandise.

IV. The appellant's contention is that the check given was an equitable assignment; but an equitable assignment of what?

It is submitted that it is impossible to designate exactly of what the check can be considered to have been an assignment, equitable or legal, and that the case presented shows no "particular fund" to have existed at all, but that it presents the ordinary case of a check drawn on a bank partly on funds on deposit and partly on funds to be deposited in the ordinary course of business, presented for payment, and dishonored because the funds to be sent had not in fact been received, or accepted as cash, by the drawee, and in respect to such a case it cannot be said that the check is an assignment of anything, or is other than a mere order to pay, subject to countermand by the assignment or insolvency of the drawer, without overruling a long line of decisions of this court which have now become the rule of decision in most of the States of the Union. It seems to be peculiarly a case in which the maxim of *stare decisis* should be applied.

MR. JUSTICE WHITE, after stating the case, delivered the opinion of the court.

As between a check holder and the bank upon which such check is drawn, it is settled that, unless the check be accepted by the bank, an action cannot be maintained by the holder against the bank. *Bank of Republic* v. *Millard*, 10 Wall. 152; *First National Bank* v. *Whitman*, 94 U. S. 343.

It is also settled that a check, drawn in the ordinary form, does not, as between the maker and payee, constitute an equitable assignment *pro tanto* of an indebtedness owing by the bank upon which the check has been drawn, and that the

mere giving and receipt of the check does not entitle the holder to priority over general creditors in a fund received from such bank by an assignee under a general assignment made by the debtor for the benefit of his creditors. *Florence Mining Company* v. *Brown*, 124 U. S. 385; *Laclede Bank* v. *Schuler*, 120 U. S. 511.

That the owner of a chose in action, or of property in the custody of another may assign a part of such rights, and that an assignment of this nature, if made, will be enforced in equity, is also settled doctrine of this court. *Trist* v. *Child*, 21 Wall. 441, 447; *Peugh* v. *Porter*, 112 U. S. 737, 742. For recent cases maintaining this principle and referring to the present state of the law on the subject in the various States, see *James* v. *Newton*, 142 Mass. 366; *National Exchange Bank* v. *McLoon*, 73 Maine, 498; and *Lanigan* v. *Bradley and Currier Co.*, 50 N. J. Eq. 201.

Whilst an equitable assignment or lien will not arise against a deposit account solely by reason of a check drawn against the same, yet the authorities establish that if in the transaction connected with the delivery of the check it was the understanding and agreement of the parties that an advance about to be made should be a charge on and be satisfied out of a specified fund, a court of equity will lend its aid to carry such agreement into effect as against the drawer of the check, mere volunteers, and parties charged with notice.

This is but an application of the general doctrine of equitable assignments or liens announced by this court in *Ketchum* v. *St. Louis*, 101 U. S. 306, where it was held, citing various authorities and text writers, that: "A party may, by agreement, create a charge or claim in the nature of a lien on real as well as on personal property whereof he is the owner or in possession, which a court of equity will enforce against him, and volunteers or claimants under him with notice of the agreement." It is immaterial, for the purposes of this case, to draw a line of distinction between equitable assignments and equitable liens or charges.

In *Risley* v. *Phœnix Bank*, 83 N. Y. 318, two counts of a complaint were based upon a check drawn upon the defendant

bank by a depositor, in favor of plaintiff, while the third count based the right to recover upon an alleged oral assignment of a part of an indebtedness owing by the bank to such depositor, to the amount of the check. The check in question was drawn May 20, 1861, by a bank in South Carolina upon a bank in New York. The trial court ruled that the plaintiff was not entitled to recover upon the causes of action founded upon the check and the verbal promise of payment, but that plaintiff was entitled to recover upon the third cause of action if the jury should find the facts to be as therein averred. A judgment upon a verdict in favor of plaintiff was affirmed, it being held (p. 327), to quote the language of the Court of Appeals in the subsequent case of *Coates* v. *First National Bank of Emporia*, 91 N. Y. 26, "in substance that when in addition to the check there was an oral agreement between the drawer and payee, by which the former for a valuable consideration, agreed to assign so much of the indebtedness of the bank to him as was represented by the check, and the check was given to enable the payee to collect and recover the portion of the debt assigned, the agreement operated as an assignment, and was sufficient to vest in the payee a title to that portion of the debt."

In the *Coates case*, the Emporia Bank interpleaded in an action brought by the assignee in insolvency of the Mastin Bank against Donnell, Lawson & Co., bankers in New York City, to recover a balance of a deposit account kept by the Mastin Bank with Donnell, Lawson & Co. The intervenor, the Emporia Bank, claimed to be entitled to a part of such balance on the ground of an assignment thereof made to it by the Mastin Bank, under the following circumstances: The Mastin Bank owed the Emporia Bank, and was requested by the latter to transfer on account thereof funds to the credit of the Mastin Bank with Donnell, Lawson & Co. The Mastin Bank replied it would do so, and at once charged the Emporia Bank, and credited themselves with $5000, and on the same day, by letter, informed the Emporia Bank that this had been done, and by letter also notified Donnell, Lawson & Co. to credit the account of the Emporia Bank with the sum named.

The Emporia Bank also gave the Mastin Bank credit for the amount. The Court of Appeals said (pp. 27–28):

"These circumstances in the conduct of both parties establish an agreement, the effect of which, as between the Mastin Bank and the Emporia Bank, was to estop the former from setting up that so much of the credit to which they were before entitled from Donnell, Lawson & Co. did not belong to the Emporia Bank, and the Emporia Bank from saying that so much of the debt before due from the Mastin Bank to it had not been extinguished. *Allen.* v. *Culver,* 3 Den. 284–292. Written out, the contract indicated by the bank entries and the correspondence is one of assignment of so much of the credit, or funds then to its credit with Donnell, Lawson & Co. to the Emporia Bank, and a discharge of a debt due by it to that bank. The whole was completed the moment the letter of the Mastin Bank to the Emporia Bank was placed in the post office. *Graves* v. *American Ex. Bk.,* 17 N. Y. 205; *Brogden* v. *Metropolitan Ry. Co.,* L. R. 2 App. Cas. 666, 692; *Ex parte Harris,* L. R. 7 Ch. App. 596; *Barry* v. *Equitable Life Assurance Society,* 59 N. Y. 587, 594; *Wayne Co. Savings Bk.* v. *Low,* 81 N. Y. 566; 37 Am. Rep. 533. . . . As between these parties the credit or funds had ceased to be the property of the Mastin Bank. The Emporia Bank was no longer creditor, because it was paid. The credit, or right to call upon Donnell, Lawson & Co. for the same amount, was the means of payment."

It was also held (p. 29), upon the authority of *Heath* v. *Hall,* 2 Rose, 271, and *Burn* v. *Carvalho,* 4 M. & C. 690, that, as rights of third parties were not involved, it was immaterial to plaintiff's right to recover that the Mastin Bank became insolvent and made a general assignment for the benefit of its creditors, of which Donnell, Lawson & Co. were notified before receipt by them of the notice from the Mastin Bank to credit the Emporia Bank. The court found (p. 30) that the entries made by the Mastin Bank on its books showed an intention on the part of the Mastin Bank to transfer to the Emporia Bank a specific amount of the deposit with Donnell, Lawson & Co., and, "taken in connection with the letters

between the parties, and the order and letter of advice sent to Donnell, Lawson & Co., they are equivalent to an actual transfer of credit, or account; to an assignment, therefore, at least in equity, of the fund in the hands of Donnell, Lawson & Co."

In *Throop Grain Cleaner Co.* v. *Smith,* 110 N. Y. 83, 88, it was again held, to quote from the syllabus in the case, that (p. 83): "While the mere delivery to a third person of a check or draft drawn by a creditor upon his debtor does not affect a legal transfer of the debt, where it appears that the intent was to make such a transfer, it is the duty of the court to carry out the intent." The court, in that case, from a review of the evidence deduced therefrom, as matter of law, an actual transfer of the debt owing by the parties upon which a check or draft had been drawn.

In the still more recent case of *First National Bank* v. *Clark,* 134 N. Y. 368, the doctrine of *Risley* v. *Phœnix Bank,* and *Throop Grain Cleaner Co.* v. *Smith,* was expressly approved. (p. 373.) The controversy was between the payee of a check and a private banker upon whom it had been drawn, the defendant denying having been at any time indebted to the maker of the check. In affirming a judgment entered upon a verdict in favor of defendant, the Court of Appeals held, despite the fact that a check had been given, that the trial judge properly left it to the jury to determine under the particular circumstances whether the alleged debt had been assigned to the plaintiff.

In *First National Bank* v. *Dubuque, Southwestern &c. Railway,* 52 Iowa, 387, the Supreme Court of Iowa held that a bill of exchange drawn upon a general fund, and not accepted by the drawee, does not operate as an assignment of the fund, but is evidence to be considered with other circumstances in determining the intention of the parties.

In *Harrison* v. *Wright,* 100 Indiana, 515, a similar ruling was made. The Supreme Court of Indiana there reached the conclusion (p. 538) "that a check in the ordinary form upon the drawer's banker, without words of transfer, and drawn upon no particular designated fund, does not, of itself, operate

as an appropriation or equitable assignment of a fund in the hands of the drawee, nor does it operate as an assignment of a part of the drawer's chose in action against the drawee."

Among the considerations upon which this holding was based was the following (p. 539):

"Second. In the absence of evidence to the contrary, or a showing of an intention to assign a part of a fund in the hands of the drawee, or a part of the drawer's chose in action against the drawee, it should be presumed that the payee or holder of a check takes it upon the credit of the drawer, of whom he may collect, if payment be refused by the drawee."

In *Gardner* v. *National City Bank*, 39 Ohio St. 600, the controversy was between assignees in insolvency and the owners and payees of a check or draft made by the insolvents. The assignees in insolvency were held to stand in the shoes of the insolvent debtors and to have only their rights in the premises, and it was adjudged that parol evidence, that the draft was for the exact amount owing by the drawers, in connection with other facts appearing from the evidence, sufficiently established the intention to transfer the property in the fund and constituted an equitable assignment thereof, good as against the general creditors of the insolvent.

In the subsequent case of *Covert* v. *Rhodes*, 48 Ohio St. 66, it was held that where a check had been given for a part of a sum on deposit, which was not presented for payment until after the maker had made a general assignment for the benefit of creditors, the holder acquired no priority over general creditors in the amount to the depositor's credit which had been surrendered to the assignee in insolvency. There were, however, no special circumstances existing in the case to take it out of the operation of the general rule applicable to a check or draft given in the ordinary course of business.

In *Hopkinson* v. *Forster*, L. R. 19 Eq. 74, it was held that a check is not an equitable assignment of the drawer's balance at his bankers, but that circumstances might coexist to create a charge upon the amount owing. Thus, in answering the contention that a letter forwarded by the maker of a check to the payee created a charge on the debt owing, the Master of

the Rolls observed (p. 75): "You can have no charge in equity without an intent to charge. The letter on which you rely was not written with any intent to charge the fund; it was a mere letter of instructions to the bankers." So, also, in *Shand* v. *Du Buisson*, L. R. 18 Eq. 283, it was held that a bill of exchange drawn for the exact amount of a fund was not an equitable assignment of the fund. It was urged, however, (pp. 288 and 289) that the defendant was entitled to the fund, because he "advanced money of his own for the payment of the debt of the debtor, and that upon a contract then entered into, he was entitled to the money, and that the bill of exchange is only evidence of that contract." The Vice Chancellor, after observing that the claim thus urged "must rest upon evidence," proceeded to consider the evidence adduced, and held it to be insufficient.

In *Thompson* v. *Simpson*, L. R. 5 Ch. 659, it was sought to establish a lien on funds by reason of the purchase of a bill of exchange drawn upon the holder of the fund. Lord Hatherley said (p. 660): "It is extravagant to say that a man who has an agent employed to pay bills creates a charge on the funds in the agent's hands by the mere drawing of a bill. It is necessary to make out a contract to charge specific funds which were with the Liverpool Bank, or which were on their road thither; for if there was only a personal contract, that would give nothing but a right of action." In the same case, Lord Justice James observed (p. 662) that "when it is attempted to make out, in addition to the written contract contained in a bill of exchange, a collateral parol agreement, it is most important to have clear and satisfactory evidence as to the exact words used."

In the case of *Citizens' Bank of Louisiana* v. *The First National Bank of New Orleans*, L. R. 6 H. L. 352, it was attempted to establish a parol contract that certain bills of exchange payable sixty days after sight should be paid out of a specific fund. The House of Lords, however, held that the evidence exhibited merely an ordinary mercantile transaction for the purchase of a bill of exchange, and did not establish that it was intended to specifically appropriate a portion

of a particular fund to the payment of the bills in question. It was, however, clearly recognized that an oral understanding, entered into in a transaction where a bill of exchange was delivered, might constitute an equitable assignment of a fund, for, in commenting upon the averments of certain facts on the subject of an assignment, Lord Chancellor Selborne said (p. 359): "That is the first part of the case, and of course, if proved, it would have been a very clear case of a contract for an equitable assignment."

In the light of these principles, we proceed to consider the facts certified, in order to ascertain whether in the transaction connected with the giving of the check in question there was either an express agreement to assign the fund, or to give a lien or charge thereon, or whether, if not express, such agreement is necessarily to be implied from the conduct of the parties, the nature of their dealings and the attendant circumstances. The facts, succinctly stated, are that the Keystone Bank, through its president, solicited the Fourth Street Bank to give to the former $25,000 of gold certificates, for which the Keystone Bank was to give its check against its reserve account in the Tradesmen's National Bank of New York City. At the same time that this request was made the president of the Keystone Bank made the further statement that his bank owed a balance at the clearing-house which it could not meet "because its funds were in the city of New York," and exhibited a memorandum showing the amount to its credit with the Tradesmen's Bank to be in the neighborhood of $27,000. In reliance upon such representations and the statements made supported by the memorandum exhibited, the Fourth Street Bank delivered to the Keystone Bank the certificates requested, and there was delivered a check for $25,000 upon the Tradesmen's National Bank of New York. The draft in question was at once forwarded to the city of New York, and was presented for payment at the Tradesmen's Bank on the following morning, when payment was refused. At the time of presentment the Tradesmen's Bank had to the credit of Keystone Bank $19,725.62 in cash and collection items amounting to $7181.70, in all $26,907.32.

Of this amount $18,056.21 had been remitted by the Keystone Bank on the day previous.

When we look at the situation of the parties and the character of the transaction disclosed by the facts just referred to, no difficulty is experienced in ascertaining the intent of the parties.   Both were banking institutions — banks of deposit. They were located in the same city.   They were not correspondents the one with the other, and there was no deposit account kept by the one with the other; indeed, so far as the usual course of commercial transactions was concerned, the banks were strangers.   The application therefore by the Keystone Bank to the Fourth Street Bank for accommodation under these circumstances precludes the conception that the relation between the parties was purely one of a usual and customary nature.

It cannot be doubted that a mere request for the loan by the Keystone Bank from the Fourth Street Bank would have been so surprising that the contract would not possibly have been made without a statement of the reason which rendered the request necessary.   It is equally clear that the mere statement of the situation which caused the request to be made would, in itself, from any standpoint of business prudence, have made it the duty of the Fourth Street Bank to refuse without full security.   It follows that the same reason which imperatively required the Keystone Bank to disclose the cause for its request, also rendered it absolutely essential, in order to obtain the loan, that it indicate a specific source or means of payment outside of and beyond its mere general credit. In other words, that it should tender ample security for the loan which it requested.   The deduction arises that, as it cannot be reasonably conceived that the loan would have been made without the reference to and assignment of the particular fund from which alone the hope of immediate payment was to be reasonably expected, the parties must have and did intend to create a particular appropriation, charge or lien on the property upon the faith of which they both dealt.   The transaction, therefore, was a proposition to borrow on the one hand, accompanied with the disclosure that security was neces-

sary and tendering the security, and on the other, hand an acceptance of such proposal and an advance made on the faith of it. Not to conclude that such was the agreement and contract contemplated and actually entered into by the parties, would lead to the impossible and contradictory theory that the minds of the parties could not and would not have met on the subject of the loan unless a prerequisite link to that meeting of minds existed, and yet at the same time to hold that the minds had met without the existence of that prerequisite which was the very essence and necessary foundation of the agreement.

Considered in other respects, a like conclusion follows. The Fourth Street Bank, as stated, was under no obligation to grant the request of the Keystone Bank; it was to derive no pecuniary advantage whatever from the proposed transaction; it was not in any sense for the convenience of the Fourth Street Bank that the contract was made, and the bank clearly contemplated an immediate reimbursement, if it delivered the certificates asked for. Had the transaction been an ordinary one, that of a time or even demand loan made with a person in good credit in the line of his business, and not, as it was, an extraordinary transaction, we might well presuppose that it was the expectation of the Fourth Street Bank that the borrower should merely have on hand with the Tradesmen's Bank when the check was presented a sufficient amount to pay it.

But the Keystone Bank, in disclosing its hazardous situation and indicating the specific fund dedicated to the payment of the solicited accommodation, did not represent that it expected to further check against the Tradesmen's Bank before the check which it proposed to give might be presented. The statements made clearly implied to the contrary, exhibiting as they did the embarrassment of the borrowing bank, arising from the need of available cash to meet its clearings, and proposing a transaction by which the Fourth Street Bank would obtain from a bank, but a few hours distant, the prompt and certain payment of its advance.

As stated, this was manifestly not an ordinary mercantile transaction, but one of an extraordinary character, and when

we consider the situation and conduct of the parties, the disclosures made at the time of the contract; and weigh the probabilities of the case, it is impossible to infer otherwise than that it was intended that the particular fund in the Tradesmen's Bank should be not only the source from which payment of the check to be given should be made, but that the fund should be transferred and appropriated *pro tanto* for that purpose. It is of course true that the method adopted to evidence the appropriation was a check drawn generally upon the Tradesmen's Bank, but, as already stated, the authorities are clear that when it is established that it was the intention and agreement of the parties to a transaction that a check drawn generally should be paid out of a particular fund, such check, as between the parties, will be treated as though an order for payment out of a specific, designated fund.

It is not material, as affecting the rights of the Fourth Street Bank in the fund, that the sum with the Tradesmen's Bank was not exclusively a cash indebtedness, but in fact consisted partly of cash then owing and of money or drafts in the course of transmission to or collection by the New York bank. The receiver took no greater rights in the property of the insolvent bank, which came into his possession than that which the insolvent bank possessed. *Scott* v. *Armstrong,* 146 U. S. 499, 507.

As the Fourth Street Bank contracted and parted with its money on the faith of the representations of the Keystone Bank that there was to its credit, in the Tradesmen's Bank, a specific sum, and the fund which came into the hands of its voluntary assignee is the fund as to which the representations were made, the Keystone Bank and its assignee are in equity estopped from asserting, to the prejudice of the Fourth Street Bank, that the character and condition of the fund was otherwise than it was represented to be.

In answer to the suggestion, made in the argument at bar, that possibly the collection items may not have belonged to the Keystone Bank, but may have been the property of others for whom the bank merely held them for collection account, it suffices to say there is no intimation to this end in the facts

stated. It is, consequently, unnecessary to determine any question as to priority of payment out of the fund, except that presented by the conflict between the Fourth Street Bank and the assignee in insolvency representing the general creditors of the Keystone Bank.

The first question propounded will therefore be answered in the affirmative, thus rendering it unnecessary to pass upon the second question certified, and

*It is so ordered.*

MR. JUSTICE GRAY, MR. JUSTICE BREWER and MR. JUSTICE PECKHAM dissented.