PARLIN & ORENDORFF IMPLEMENT CO. et al. v. MOULDEN.

In re ANDREWS.

(Circuit Court of Appeals, Fifth Circuit.   December 1, 1915.   Rehearing
Denied January 4, 1916.)

No. 2817.

BANKRUPTCY ☞399—HOMESTEAD—EQUITABLE LIEN.

 A bankrupt, whose stock in trade was destroyed by fire a short time
before the bankruptcy, wrote his principal creditors that as soon as he
could collect his insurance it would be used in paying his debts. *Held*,
that he thereby created an equitable lien on the fund in favor of his
creditors, and could not hold as a homestead property which he bought
with the insurance money.

 [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 657, 669;
Dec. Dig. ☞399.]

Petition to Superintend and Revise from the District Court of the
United States for the Eastern District of Texas; Gordon Russell,
Judge.

In the matter of A. B. Andrews, bankrupt; R. L. Moulden, trustee.
Petition by the Parlin & Orendorff Implement Company and others
to revise an order allowing a homestead exemption to the bankrupt.
Reversed.

Francis Marion Etheridge, Joseph Manson McCormick, and Henrie
Louie Bromberg, all of Dallas, Tex., for petitioners.

R. R. Neyland, of Greenville, Tex. (R. C. Merritt, of McKinney,
Tex., and N. E. Peak, of Greenville, Tex., on the brief), for respond-
ent.

Before PARDEE and WALKER, Circuit Judges, and SPEER, Dis-
trict Judge.

WALKER, Circuit Judge.  On May 6, 1913, prior to the institution
of the bankruptcy proceedings, the bankrupt's stock of merchandise
was destroyed by fire.  It was insured to the amount of $5,000, but
the bankrupt then owed more than this amount.  He had previously
assigned the policies to a bank to secure his indebtedness to it of about
$1,560.  Immediately after the fire the bankrupt communicated with
his principal creditors by telephone and by letter, made mention of
the fire and of the insurance he held, and stated that as soon as he got
the insurance money he would pay his creditors as far as it would
go.  In a short time he collected $4,950.10 on the policies, and used the
part of that amount remaining after the payment of the debt to the
bank in the purchase of a homestead.  The referee stated his conclu-
sions as follows:

"The evidence discloses that immediately after the fire the bankrupt by
phone and by letter notified his creditors thereof and caused them to believe
that as soon as he collected his fire insurance he would settle with them in
full or in part at least.  The creditors rested upon this belief and took no
steps to fix a lien by process of law upon the debtor's assets.  The bankrupt
testified at this time it was his intention to apply his insurance upon his

_____

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

debts, and there is nothing in evidence to contradict this, except his failure to carry it out, but that later he and his wife decided to invest a larger part of the money as a homestead."

It was adjudged by the court that the real estate so purchased by the bankrupt was his homestead, that it was not a part of the bankrupt estate, and that it could not be subjected to the payment of his debts.

The bankrupt's communications with his creditors after the fire had reference to specific personal property of which he was the owner, and clearly manifested his agreement to charge that specific property with the payment of his debts. As matters stood when these statements were made, it was open to the creditors by attachment or garnishment proceedings to subject the policies of insurance, or the amounts payable on them, to liens in their favor. The debtor's voluntary undertaking to dedicate to the payment of his debts the collections to be made on those choses in action was calculated to induce his creditors to forego legal proceedings looking to the same end. What he did stands upon a different footing from a mere promise by him to pay his debts, unaccompanied by a reference to specified property and a manifestation of an intent to charge it. Under familiar principles, a court of equity gives to an agreement that certain property shall be appropriated to the payment of an indebtedness the effect of creating a charge upon that property:

"The doctrine may be stated in its most general form, that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands, not only of the original contractor, but of his heirs, administrators, voluntary assignees, and purchasers or incumbrancers with notice. Under like circumstances a mere verbal agreement may create a similar lien upon a personal property. The ultimate grounds and motives of this doctrine are explained in the preceding section; but the doctrine itself is clearly an application of the maxim, 'Equity regards as done that which ought to be done.' In order, however, that a lien may arise in pursuance of the doctrine, the agreement must deal with some particular property, either by identifying it, or by so describing it that it can be identified, and must indicate with sufficient clearness an intent that the property so described, or rendered capable of identification, is to be held, given, or transferred as security for the obligation." 3 Pomeroy's Equity Jurisprudence (3d Ed.) § 1235.

The above statement was quoted with approval in the opinion rendered in the case of Walker v. Brown, 165 U. S. 654, 664, 17 Sup. Ct. 453, 41 L. Ed. 865, and the doctrine announced was there so applied as to lead to the holding that certain bonds were subjected to a charge for the payment of debts owing by a third party as a consequence of a statement made with reference to them by their owner in a letter to the creditor which did not more clearly indicate that they were to stand as security for such debts than the above referred to statements of the bankrupt indicated that the collections on his insurance policies were to be applied to the payment of his debts. The same doctrine was applied in the case of Fourth Street Bank v. Yardley, 165 U. S. 634, 17 Sup. Ct. 439, 41 L. Ed. 855, with the result that it was

there held that the circumstances of the giving of a check by one bank to another were such that the transaction had the effect of creating an equitable assignment of or lien upon the deposit against which the check was drawn, and was not governed by the general rule that a check, drawn in the ordinary form, does not, as between the maker and the payee, constitute an equitable assignment pro tanto of an indebtedness owing by the bank upon which the check has been drawn. In the course of the opinion rendered in that case it was said:

"Whilst an equitable assignment or lien will not arise against a deposit account solely by reason of a check drawn against the same, yet the authorities establish that if in the transaction connected with the delivery of the check it was the understanding and agreement of the parties that an advance about to be made should be a charge on and be satisfied out of a specified fund, a court of equity will lend its aid to carry such agreement into effect as against the drawer of the check, mere volunteers, and parties charged with notice." Fourth Street Bank v. Yardley, supra, 165 U. S. page 644, 17 Sup. Ct. 440, 41 L. Ed. 855.

The frequency of the application in the federal courts of the doctrine in question is indicated by the citations which accompany the above-quoted and the two succeeding sections of Mr. Pomeroy's text. In the section of that work (section 1234) which is referred to in the above quotation as containing a statement of the ultimate grounds and motives of the doctrine it is said:

"In a large class of executory contracts, express and implied, which the law regards as creating no property right, nor interest analogous to property, but only a mere personal right and obligation, equity recognizes, *in addition to the personal obligation*, a peculiar right over the thing concerning which the contract deals, which it calls a 'lien,' and by means of which the plaintiff is enabled to follow the identical thing, and to enforce the defendant's obligation by a remedy which operates directly upon that thing. The theory of equitable liens has its ultimate foundation, therefore, in contracts, express or implied, which either deal with or in some manner relate to specific property, such as a tract of land, particular chattels or securities, a certain fund, and the like."

That the bankrupt's agreement with his creditors as to the application of the amounts to be collected on his insurance policies was such a contract as is described in that statement seems plain. What he did amounted to an unequivocal dedication of the proceeds of the policies, so far as they were subject to his control, to the payment of his debts. This had the effect of conferring upon the creditors with whom he communicated a right over the thing concerning which the contract dealt, and of enabling them, in a court which applies equitable doctrines, to follow the identical thing, and to enforce the bankrupt's obligation by a remedy which operates directly upon that thing. In other words, those creditors were entitled to have the proceeds of the insurance policies applied as the bankrupt agreed that they should be applied—to treat that as having been done which had been agreed to be done. This right existed against those proceeds when they were by the bankrupt, in violation of his agreement, invested in real estate. See Goodnough Mercantile & Stock Co. v. Galloway (D. C.) 171 Fed. 940; Wilder v. Watts (D. C.) 138 Fed. 426. The homestead rights acquired by the bankrupt and his wife in that property were subordi-

nate to the rights of the creditors in the fund made use of in making that investment. The assertion of the homestead rights cannot be allowed to defeat the prior and superior rights of the creditors to follow the fund into the property in which it was so improperly invested, and to subject that property to the charge to which the money used in the purchase was subject when the purchase was made.

It follows that the prayer of the petition to superintend and revise should be granted, and the ruling presented for review reversed; and it is so ordered.