REO MOTOR CAR CO. *v.* THE WESTERN BANK & TRUST CO.

(Decided June 11, 1934.)

*Mr. W. B. Mente* and *Messrs. Foster & Cameron,* for plaintiff in error.

388

*Messrs. Peck, Shaffer & Williams,* for defendant in error.

Ross, J. This is a proceeding in error from the Court of Common Pleas of Hamilton county, wherein judgment was rendered for the defendant, The Western Bank & Trust Company. The plaintiff, the Reo Motor Car Company, brought suit against the defendant, alleging that it was caused to proceed to its damage by reason of the promises of the defendant, upon which it relied, wherefor it sought judgment for the amount of its loss.

The answer of the defendant was in effect a general denial.

The evidence shows that the Herold Motor Car Company was a distributor of automobiles for the Reo Motor Car Company of Lansing, Michigan; that the Herold Motor Car Company carried its banking account with The Western Bank & Trust Company; that in August, 1929, the Herold Motor Car Company, having received an order from a firm in Indiana for a so-called Reo Speed Wagon, sent an employee to the home office of the Reo Motor Car Company in Lansing, Michigan, to purchase such a car; that the employee presented the ordinary uncertified check of the Herold Motor Car Company to the Reo Motor Car Company and sought possession of the automobile; that an employee of the Reo Motor Car Company telephoned The Western Bank & Trust Company, on Saturday, August 31, 1929, and talked to its vice-president, who was asked by such employee if the Herold Motor Car Company had sufficient funds on hand to cover the check; the vice-president was also advised that the reason for such inquiry was that the Reo Motor Car Company had been advised that an officer of the Herold Motor Car Company had recently absconded with a large portion of the funds of such company, and the Reo Motor Car Company was in

doubt as to its financial status. The evidence further discloses that the vice-president stated that he knew of such fact, but that there were on hand ample funds to meet the amount of the check, that the bank would set aside and hold funds to meet the check, that a notation would be made to this effect in the records of the bank, and that the following notation was found in the records of the bank, upon a slip of paper placed in the records of the bank, ''Check of Herold Motor Car Co. payable to Reo Motor Car Co. for $1510.80. Hold this amount until check comes in.''

The credit manager of the Reo Motor Car Company testified as follows:

''A. I called for the cashier, as I said before, and I told him that we had a check for $1510.80, on the Herold Motor Car Company, and asked him if they had funds on deposit there. He left the phone and in a few minutes came back and said there was plenty of funds to take care of that. He said his name was Mr. Widman, and that he wanted to know why we wanted it certified. I told him that Mr. Chandler had absconded about August 8th, I believe, some time previous to that, and we could not take the check without having some certification or approval by the bank, and Mr. Widman stated that he knew the circumstances and offered to set the funds aside and hold them out for us, and he finally said he would mark his records to make a notation of it some way, so it would be all right, and in further talking with him I asked him if I should send him a telegram or would he send us a telegram, or should I send him a letter. He said, 'no; send it through in the regular way and we will take care of it.'

''Q. What then did you do with the check?

''A. I made a notation on the check as the conversation we have just spoken of, then would hold it in the office and deposit it in the regular way.''

The vice-president testified:

"A. I think I made a statement to the bookkeeper that I was called over the long distance telephone about a check regarding the Herold Motor Car Company, payable to the Reo Motor Car Company, and that I told the Reo Motor Car Company that we will hold this amount."

The credit manager of the Reo Motor Car Company testified that he asked whether the conversation should be confirmed by wire, and was advised by the vice-president that this was unnecessary, and to send the check through in the regular way. This is denied.

On September 4, a receiver was appointed for the Herold Motor Car Company. On September 6, the check was presented for payment and refused. On the same day the defendant bank applied the entire deposit balance of the Herold Motor Car Company, amounting to $2159, to the satisfaction and payment of the notes of its depositor to the bank. On September 12, the Herold Motor Car Company went into bankruptcy, and was adjudged a bankrupt October 3, 1929. On September 5, the day after the appointment of the receiver, the bank wired the plaintiff: "Herold check will not be paid receiver appointed."

The bank held a surety bond signed by four individuals guaranteeing the indebtedness of the Herold Motor Car Company.

Under the laws of Ohio a check is held to be a bill of exchange. Section 8290, General Code. An acceptance of a bill of exchange in order to be binding must be in writing signed by the drawee. Section 8237, General Code. Such are the rules under the Negotiable Instrument Law. L. R. A., 1916C, 177, note. The payee of the check is presumed to know the law, and, therefore, presumed to know that the bank could not accept the check except as provided by law. Certainly the officers of the bank would have no authority to bind the institution to such a responsibility.

To permit a rule contrary to that of the Negotiable

Instrument Law, as expressed in our statutes, to prevail, would open the door to the fraud which the law and the statutes are designed to prevent.

The theory of the plaintiff in error is based upon the rules laid down in Restatement of the Law of Contracts, 100 and 110, Sections 85 and 90, which are:

"Neither a manifestation of assent, unless the promise is in terms conditional upon such a manifestation, nor consideration is requisite for the formation of an informal contract in the cases enumerated in Sections 86-90."

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

This rule can have no application to a situation which both parties must know is governed by specific law, directly prohibiting the liability now sought to be enforced. In any event, it certainly cannot be successfully contended that the bank intended to become directly liable for the amount of the check as against the contingency of receivership or attachment, or other claims upon the fund over which it could have no control.

There is no substantial authority justifying the doctrine of equitable assignment in the presence of direct law applicable to the situation.

The case of *Fourth Street National Bank* v. *Yardley, Rec.,* 165 U. S., 634, 17 S. Ct., 439, 41 L. Ed., 855, is cited as direct authority for the application of the rule of equitable assignment to this case. The facts in the *Yardley case* are as follows: "On the 19th day of March, 1891, the said Fourth Street National Bank advanced twenty-five thousand dollars ($25,000) in clearing-house gold certificates to the said Keystone National Bank to enable it to meet its debtor balance in

the Philadelphia clearing-house under these circumstances. On said date Gideon W. Marsh, the president of the Keystone National Bank, acting on its behalf and by its authority, came to the banking room of the said Fourth Street National Bank, in the city of Philadelphia, and there represented to the officials of that bank that the Keystone National Bank owed a balance at the clearing house which it could not meet, because its funds were in the city of New York, and exhibited to them a memorandum showing a balance to the credit of the Keystone National Bank in the Tradesmen's National Bank of the city of New York of about twenty-seven thousand dollars ($27,000) stating that his bank wished to draw against it and get clearing-house certificates; and he asked the Fourth Street National Bank to accept the draft of the Keystone National Bank for twenty-five thousand dollars ($25,000) against this 'reserve account in the New York bank'— that is to say, against the said fund in the Tradesmen's National Bank—and give his bank clearing-house gold certificates therefor. Relying upon these representations of Marsh, and on the faith of his statement, supported by the said memorandum, that the Keystone National Bank had in the Tradesmen's National Bank the specified fund against which it proposed to draw, the Fourth Street National Bank gave Marsh, for the use of the Keystone National Bank, clearing-house gold certificates to the amount of twenty-five thousand dollars ($25,000) and took its draft, of which the following is a copy:

" 'Keystone National Bank. No. 5086.
" 'Philadelphia, March 19, 1891.
" 'Pay to the order of R. H. Rushton, cashier, ($25,000) twenty-five thousand dollars.
" 'John Hayes, *Cashier.*
" 'To the Tradesmen's National Bank, New York.'

"R. H. Rushton was the cashier of the Fourth Street National Bank.

"The books of the Keystone National Bank show that on the 19th day of March, 1891, it had to its credit in the Tradesmen's National Bank of the city of New York the sum of twenty-six thousand nine hundred and seven and 32/100 dollars ($26,907.32), and on the same day an entry was made therein charging against that credit the said draft for twenty-five thousand dollars ($25,000) it had given to the Fourth Street National Bank.

"The draft for twenty-five thousand dollars ($25,-000) was duly forwarded to New York for collection and was presented for payment to the Tradesmen's National Bank on the morning of March 20, 1891. Payment thereof was refused upon the ground that the drawee had not in hand funds of the drawer sufficient to pay the same. In fact, the Tradesmen's National Bank had in cash and in collection items (drafts) for the Keystone National Bank the sum of twenty-six thousand nine hundred and seven and 32/100 dollars ($26,907.32), of which eighteen thousand and fifty-six and 21/100 dollars ($18,056.21) were remitted by the latter-named bank to the former on March 19, 1891, and the rest previously. The Tradesmen's National Bank then had in hand in cash to the credit of the Keystone National Bank the sum of nineteen thousand seven hundred and twenty-five and 62/100 dollars ($19,725.62), and had in addition the said collection items to make up the full sum of twenty-six thousand nine hundred and seven and 32/100 dollars ($26,-907.32). Afterwards this money was paid and the said collection items or drafts were turned over to Robert M. Yardley, the receiver of the Keystone National Bank, and out of the collection items he realized sixty-one hundred dollars ($6,100), and he thus had in his hands from this source when the bill in this case was

filed the sum of twenty-five thousand eight hundred and twenty-five and 62/100 dollars ($25,825.62) in cash.

"On the 20th day of March, 1891 (some time during the morning), by the order of the Comptroller of the Currency of the United States, the Keystone National Bank was closed, and thereafter Robert M. Yardley was appointed receiver thereof."

Let us substitute the parties in the instant case for those in the *Yardley case,* as they appropriately apply, —the Keystone National Bank for the Herold Motor Car Company; the Fourth Street National Bank for the Reo Motor Car Company; and the Tradesmen's National Bank for The Western Bank & Trust Company. At once, the entire lack of similarity in principle is apparent. If, in the instant case, the Herold Motor Car Company had in a specific agreement with the Reo Motor Car Company effected an equitable assignment of its deposit in The Western Bank & Trust Company, then the *Yardley case* holds that the receiver of the Herold Motor Car Company would have been bound thereby.

In similar manner, the other citations in support of the contention of assignment can be distinguished. Under the common law, oral acceptances were permitted. Under the Negotiable Instrument Law, they are forbidden. The reason is as obvious as the reason for any statute of frauds.

The fact that the funds ultimately were applied to the indebtedness of the depositor to the bank is a matter between the receiver and the bank. The other alternative would have been to permit the receiver to take the deposit. Certainly the promisee is not prejudiced by the action of the bank in securing what in no event could be taken by the promisee, the Reo Motor Car Company.

The authority of the receiver cannot be questioned collaterally in this action.

*Judgment affirmed.*

HAMILTON, P. J., concurs.