STEWART v. PEOPLES–TICONIC NAT. BANK et al.

District Court, D. Maine, Southern Division. Oct. 22, 1935.

Harvey D. Eaton, of Waterville, Me., for plaintiff.

F. Harold Dubord, of Waterville, Me., for defendants.

PETERS, District Judge.

This is a bill in equity to redeem from a real estate mortgage.

### Findings of Fact.

In 1902 the plaintiff and her husband mortgaged their house and lot in Waterville to J. Colby Blaisdell of that city, who afterwards died leaving a will in which the defendant bank, then under another name, was appointed executor. The mortgage took the form of an outright deed to Mr. Blaisdell with a bond of even date executed by him undertaking to reconvey upon payment of the sum loaned, $4,000, with interest. Such a transaction is a mortgage under the laws of Maine.

Payments on account of principal and interest were made from time to time by the Stewarts to Mr. Blaisdell during the 29 years that he lived after the mortgage transaction, and, after his death, to the bank as executor, until, on November 3, 1932, there remained due $1,300.

Shortly afterward the husband of the plaintiff, acting for her, as he did throughout, went to the bank and arranged with the president that on the third day of January, following, the Stewarts should be at the bank to "take up the mortgage and get the deed," meaning the deed called for by the bond given by the bank's testator at the time he received the deed from the Stewarts and loaned them the $4,000.

On the date appointed Mr. Stewart was at the bank, and, in the language of the answer filed by the bank in this suit, then and there "tendered to the officials of the Peoples-Ticonic National Bank a cashier's check, drawn on the Federal Trust Company of Waterville, Maine, in the amount of $1313.00 in payment of the balance of plaintiff's debt to the estate of J. Colby Blaisdell."

The president of the bank then stated that the deed had not been drawn, as its lawyer was away. Thereupon the check was left with the bank and deposited to the credit of Mrs. Stewart, the plaintiff here, who had a small checking account there, the president of the bank being informed by Mr. Stewart that he would in a few days bring in a check on that deposit.

In about three days Mr. Stewart again appeared at the bank with his wife's check for $1,313 drawn on this deposit, and called for the deed, exhibiting the check. He was then informed by the president of the bank that the bank as executor would have to be authorized by the probate court to give the deed. Mr. Stewart objected that such action was not necessary, and quoted a legal opinion to that effect, but without avail, and his insistence upon prompt action and his numerous visits and telephone calls to the bank continued until February 27 or 28, 1933, when he went again and found the license and the deed he sought—the latter made out but not signed. The president, who received word that Mr. Stewart was there as usual for his deed, sent word from another room that he was busy and suggested that Mr. Stewart call again the next day. He did so, and also the next day and the next, and every day, with growing anxiety, until the fourth of March when the well-known cataclysm occurred. However, that did not wholly deter Mr. Stewart, who continued to seek his release of mortgage, going frequently to the bank. He says: "I would be going still, but it isn't of any use. I would like to say that Mr. Vigue (the president) had never refused to sign the deed; even after the bank was closed. He wasn't quite sure whether he would sign it then or not; but of course I kept going and asking him to."

The deed was never signed, or at any rate never delivered, and, a receiver having been appointed for the bank, the Stewarts seek their remedy here, asking for what amounts to a release of the mortgage on their property.

The $1,313, referred to as deposited by the Stewarts was "put in there," as Mr. Stewart puts it, "for the paying of that mortgage," and for no other purpose. It was so understood by the Stewarts and the officers of the bank. It remained there in its entirety until the bank closed.

During the two months that elapsed before the bank closed, the Stewart account shows two small items credited for interest, one of 82 cents, and one of $1.59, so

credited in accordance with the rate paid by the bank on daily balances in excess of $500. This was done in the bank without any previous arrangement with and without the knowledge of the depositor.

The defendants contend that the money left with the bank by the Stewarts created the ordinary relation of debtor and creditor, leaving Mrs. Stewart a general creditor of the bank, and that she must now pay the same amount again to the receiver to obtain a release of the mortgage.

### Conclusions of Law.

Some confusion of thought may be avoided by recalling that the res in question is the real estate mortgage in the hands of the bank as executor, and that the Stewarts were dealing with the bank in that capacity.

■ The receiver took his title subject to existing rights and equities.

"The receiver takes the assets of the bank as a mere trustee for creditors, and not for value and without notice, and, in the absence of statutes to the contrary, subject to all claims and defenses that might have been interposed as against the insolvent corporation before the liens of the United States and of general creditors attached. Scott v. Armstrong, 146 U. S. 499, 507, 13 S. Ct. 148, 36 L. Ed. 1059. And he takes no greater rights in the property than the insolvent bank itself possessed. Fourth Street National Bank v. Yardley, 165 U. S. 634, 643, 17 S. Ct. 439, 41 L. Ed. 855; Lyons v. Westwater (C. C.) 173 F. 111; Auten v. City Electric St. Ry. Co. (C. C.) 104 F. [395] 400." Williams v. Green (C. C. A.) 23 F.(2d) 796, 798.

■ The receiver found a sum of money to the credit of Mrs. Stewart on the books of the bank, and, in the absence of further information, quite properly assumed that it was, what it appeared to be, a debt to her from the bank; but it now appears that it really was part of a transaction with the bank in its capacity as executor, whereby the Stewarts were redeeming a mortgage. It is quite permissible to look at the real nature of the transaction, in spite of its appearance. Equity looks to the intent rather than to the form.

"It is only by looking at the intent, rather than at the form, that equity is able to treat that as done which in good conscience ought to be done. * * * Equi-

ty always attempts to get at the substance of things and to ascertain, uphold and enforce rights and duties which spring from the real relation of parties. It will never suffer the mere appearance and external form to conceal the true purposes, objects and consequences of a transaction." Pomeroy's Equity (4th Ed.) par. 378.

The nature of deposits in a bank was discussed by the Supreme Court in Commercial Nat. Bank v. Armstrong, 148 U. S. 50, 59, 13 S. Ct. 533, 535, 37 L. Ed. 363:

"All deposits made with bankers may be divided into two classes, namely, those in which the bank becomes bailee of the depositor, the title to the thing deposited remaining with the latter; and that other kind of deposit of money peculiar to banking business, in which the depositor, for his own convenience, parts with the title to his money, and loans it to the banker, and the latter, in consideration of the loan of the money, and the right to use it for his own profit, agrees to refund the same amount, or any part thereof, on demand."

"Whether a deposit in the bank is general or special depends upon the contract resulting from the mutual understanding and intention of the parties at the time such deposit is made." Northern Sugar Corporation v. Thompson (C. C. A.) 13 F. (2d) 829, 831. Fogg v. Tyler, 109 Me. 109, 82 A. 1008, 39 L. R. A. (N. S.) 847, Ann. Cas. 1913E, 41.

■ As there was no intent on the part of the Stewarts to part with the title to the money and loan it to the banker with the right to use it for his own profit, but, on the contrary, a definite and fixed intent, known to and participated in by the banker, to use it for the purpose of paying the mortgage held by the bank as executor, the presumption that a general deposit was made is sufficiently rebutted.

In cases like Blakey v. Brinson, 286 U. S. 254, 52 S. Ct. 516, 76 L. Ed. 1089, 82 A. L. R. 1288, relied upon by the defendant, a plaintiff fails to remove himself from the category of a general depositor because there is either no intent shown to establish a trust or there is no identifiable thing which could be the subject of it.

■ That is not the case here; and the identifiable thing is the mortgage of real estate which the executor bank held. Tender of payment was made before the bank closed. The money was actually left with the bank, and, under the circumstances,

may properly be considered earmarked for the purposes intended. Equitably it should be devoted to that purpose.

I see no reason why the bank as executor should not complete the transaction by releasing the mortgage and charging itself as executor with the amount received.

The bill is sustained with costs. A decree may be entered accordingly directing the execution of a release to be joined in by the receiver to clear up the record title.