MULLER et al. v. KLING.

(Supreme Court, Appellate Division, First Department. February 2, 1912.)

1. ASSIGNMENTS (§ 50*)—DRAFTS—ASSIGNMENT OF PARTICULAR FUND.

A draft drawn on the general credit of the drawer with the drawee does not operate to assign a particular account or fund, though the draft indicates the account or fund to be charged; but where the parties intend that the draft shall be paid out of a particular fund, and not at all events, it operates as an assignment thereof.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. §§ 99–105; Dec. Dig. § 50.*]

2. SUBMISSION OF CONTROVERSY (§ 17*)—SCOPE OF INQUIRY OF COURT.

The court on a submission of controversy on an agreed statement of facts must confine its decision to the facts stated; and, where conflicting inferences are permissible, it may not choose between them.

[Ed. Note.—For other cases, see Submission of Controversy, Cent. Dig. § 19; Dec. Dig. § 17.*]

3. BILLS AND NOTES (§ 313*)—DRAFTS—PURCHASERS—RIGHTS ACQUIRED.

A drawer in New York of a draft on a drawee in France induced plaintiff to purchase the draft by exhibiting to him a letter by the drawee promising to accept drafts on the security of drafts drawn by the drawer on a third person in Italy to be furnished therewith, and at the same time the drawer informed plaintiff that he would secure the draft by sending to the drawee a draft on the third person who was indebted to the drawer. The drawer drew such draft, and plaintiff sent the draft purchased by him to his correspondent in Paris for presentment to the drawee, but, before it was presented, the drawer under the law of New York made a general assignment for the benefit of creditors, and the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

drawee refused to accept the draft when it was presented, and, without presenting the draft on the third person for payment, returned it to the assignee for creditors. *Held,* that the purchase of the draft on the drawee's promise to accept it, coupled with the drawer's promise to secure the drawee, equitably entitled plaintiff to the promised security on the failure of the drawee to pay, and plaintiff could resort to the fund represented by the draft on the third person.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 746–750; Dec. Dig. § 313.*]

Dowling and Laughlin, JJ., dissenting.

Submission of controversy on agreed statement of facts by Frederick Muller and others, copartners, doing business under the firm name of Muller, Schall & Co., against Joseph Kling, general assignee for the benefit of creditors of the firm of Scholtz, Sanchez & Co. Judgment for plaintiffs.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, MILLER, and DOWLING, JJ.

George A. Strong, for plaintiffs.
Charles S. Yawger, for defendant.

MILLER, J. On May 9, 1898, the firm of Scholtz, Sanchez & Co. drew the following draft:

No. 1233.                  New York, May 9th, 1898.
No. 45305 ne varietur.
Exchange for Frcs. 35,000.
At sixty days after sight of this first of exchange (Second not paid) pay to the order of Messrs. Muller, Schall & Co., the sum of thirty-five thousand francs, value received, which place to account as advised.

                             Scholtz, Sanchez & Co.
                                (de N. & Cie.)

To Messrs. Demachy & F. Seilliere, Paris.
     Rue de Provence 58.

And it on May 10, 1898, in the city of New York, sold it to the plaintiffs, the payees, and received therefor the sum of $6,662.50. To induce the plaintiffs to purchase the draft, the drawers exhibited to them a letter, written by the drawees, promising to accept the drawers' drafts up to the limit of 250,000 francs upon the security of drafts drawn by the latter upon Jose Invernizio of Tortona, Italy, to be furnished therewith; and at the same time the said drawers informed the plaintiffs that they would secure said draft by sending to the drawees another for like amount upon said Invernizio, and that the latter was indebted to them in that amount upon an open account for goods sold, which was the fact. The said drawers did draw the following draft:

              Scholtz, Sanchez & Co.    No. 1234.
                           New York, May 9th, 1898.
Exchange for Frs. 35,000.
At sixty days after sight of this first of exchange (Second not paid) pay to the order of Messrs. Demachy & F. Seilliere the sum of thirty-five thousand francs. Payable in Paris. Value received which place to account as advised.                     Scholtz, Sanchez & Co.
To Mr. Jose Invernizio, Tortona, Italy.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

And sent it to the payees therein named, the drawees of the first draft, with a letter of advice, in which they stated:

"Against the remittance we have taken the liberty of drawing on you our draft #1233 at 60 days sight, in favor of Messrs. Schall & Co. for Fcs. 35,000 which please accept as usual."

They also on the same day wrote to Invernizio referring to his having authorized them to draw at sight on him for account of shipments made to his house in Caracas, and informing him of said draft drawn upon him. The plaintiffs sent the draft purchased by them to their Paris correspondent for presentment to the drawees, but, before it was presented, the drawers, under the laws of the state of New York, made a general assignment for the benefit of creditors to the defendant; wherefore the drawees refused to accept the draft when it was presented, and, without presenting the Invernizio draft for payment, returned it to the defendant. Both the plaintiffs and the defendant thereupon made claim upon Invernizio for the amount of the draft drawn upon him. Thereafter it was arranged that Invernizio should pay the defendant, and that the latter should hold the money subject to a determination between him and the plaintiffs, as to who had the better right to it. Accordingly, upon the delivery to him of said two drafts, a letter of the plaintiffs, withdrawing all claim against him, and a release of the defendant, Invernizio paid to the defendant the sum of $4,931.13. This controversy is to determine who has the better right to said fund and the accumulated interest.

At first glance, it seems plain that in equity and good conscience the plaintiffs have the better right to the fund, but, when we come to support our off-hand impression by settled principles, we encounter difficulties.

[1] Both drafts were upon their face negotiable bills of exchange, and it is well settled that a draft, drawn upon the general credit of the drawer with the drawee, does not operate to assign a particular account or fund, even though one is indicated to which the draft is to be charged or out of which the drawee is to reimburse himself, as the case may be. If, however, it was the intention and understanding of the parties that the draft should be paid out of a particular fund and not absolutely and at all events, it will operate as an assignment thereof. Brill v. Tuttle, 81 N. Y. 454, 37 Am. Rep. 515.

[2] Our difficulty is not lessened by the circumstance that the case is submitted upon an agreed statement of facts, for, if conflicting inferences are permissible, we may not choose between them, but must confine our decision to the facts stated. Bradley v. Crane, 201 N. Y. 14, 94 N. E. 359; Marx v. Brogan, 188 N. Y. 431, 81 N. E. 231, 11 Ann. Cas. 145.

[3] I think it is a necessary conclusion from these facts that the plaintiffs purchased the draft on Demachy & F. Seilliere on the faith of their promise to accept it upon the security of the Invernizio draft to be furnished therewith, and on the faith of the drawers' promise to send to the drawees a draft for like amount on Invernizio, and in reliance upon the drawers' assurance that Invernizio was indebted to them in that amount. While the precise terms of the stipulation do not go so far, it seems to me that such is their necessary import. The

letter of Demachy & F. Seilliere was exhibited to the plaintiffs to induce them to make the purchase at the same time the drawers informed the plaintiffs that they would send to Demachy & F. Seilliere the security required—i. e., a draft on Invernizio—and that the latter owed them the amount of the draft. While the word "informed" is used in the stipulation, it seems obvious that it is to be construed to mean "promised," and that the information given was intended as an assurance to be relied upon, else there was no point in including it in the statement of agreed facts. Thereupon, so the stipulation reads—i. e., upon being informed that the required draft on Invernizio would be forwarded and that the latter owed the drawers that amount—the plaintiffs purchased the draft on Demachy & F. Seilliere. It is not to be assumed that the information given the plaintiffs was to satisfy idle curiosity.

If Demachy & F. Seilliere had accepted the draft on them, but had failed to pay at maturity, the plaintiffs on the principle of subrogation would have been entitled to the Invernizio draft, or its proceeds. Ten Eyck v. Holmes, 3 Sandf. Ch. 428; Vail v. Foster, 4 N. Y. 312; Wager v. Link, 134 N. Y. 122, 31 N. E. 213; Id., 150 N. Y. 549, 44 N. E. 1103. I am unable to perceive how in principle the case is any different from the fact that the drawees broke their promise to accept, instead of a promise to pay after acceptance. They had given a promise to accept, qualified only by the condition that they be furnished a like draft on Invernizio. On the faith of that promise and the drawers' promise to comply with that condition, the plaintiffs paid $6,662.50 to the latter. Upon the receipt by the drawees of the Invernizio draft, they stood in a sense as surety for the drawers to the plaintiffs, who had advanced money on the faith of their promise.

It is frequently a nice question to what extent a promise to accept a bill not in existence binds the promisor to third parties who have acted on the faith of it. Section 223 of the negotiable instruments law provides:

"An unconditional promise in writing to accept a bill before it is drawn is deemed an actual acceptance in favor of every person who, upon the faith thereof receives, the bill for value."

The Revised Statutes contained the same provision (see 1 R. S. c. 768, § 8), which was but declaratory of the common law (see Mason v. Hunt, 1 Doug. 297). In that case Lord Mansfield said:

"But an agreement to accept is still but an agreement, and if it is conditional, and a third person takes the bill knowing of the conditions annexed to the agreement, he takes it subject to such conditions."

See on the general subject Coolidge v. Payson, 2 Wheat. 66, 4 L. Ed. 185; Murdock v. Mills, 11 Metc. (Mass.) 5; Greele v. Parker, 5 Wend. 414; Bank of Michigan v. Ely, 17 Wend. 508; Ulster County Bank v. McFarlan, 5 Hill, 432; Id., 3 Denio, 553; Shaver v. Western Union Tel. Co., 57 N. Y. 459; Merchants' Bank v. Griswold, 72 N. Y. 472, 28 Am. Rep. 159; Ruiz v. Renauld, 100 N. Y. 256, 3 N. E. 182; Germania National Bank v. Taaks, 101 N. Y. 442, 5 N. E. 76; Story on Bills, § 249; 1 Parsons on Notes & Bills, 292. To be sure, the negotiable instruments law only covers the case of an unconditional

promise to accept, doubtless because, in general, conditions attached to commercial paper deprive it of the attribute of negotiability, though an acceptance of a bill may be conditional. The fact that the promise to accept in this case was conditional upon the drawees' having security is a cogent, if not a controlling, reason, for thinking that the bills were not drawn on the general credit of the drawers, and that the rules applicable to negotiable bills do not apply. Very likely the obligations of the drawees depend on the laws of France (see Boyce v. Edwards, 4 Pet. 111, 7 L. Ed. 799), but it is not necessary for us to determine precisely what these obligations were. We are dealing with a contract made in the state of New York, and are directly concerned only with the rights of the immediate parties to it as between themselves. It is sufficient for our purpose to hold that the purchase of a draft upon the drawees' promise to accept it, coupled with the drawers' promise to secure the drawees, equitably entitled the purchasers to the promised security upon the failure of the drawees to fulfill their promise, and that, too, independently of the precise nature of the obligation assumed by the drawees on making the promise.

The question still remains whether the Invernizio draft operated to transfer, or to create any charge or lien upon, Invernizio's debt to the drawers. If the plaintiffs have no interest or right in the Invernizio draft except by subrogation to the rights, which Demachy & F. Seilliere would have had upon their acceptance of the draft on them, our consideration of that question must be confined to the intention and understanding of the drawers and Demachy & F. Seilliere, the payees as between themselves; and here we are confronted with the difficulty that the statement of agreed facts does not disclose precisely what the arrangement between them was. We know that Demachy & F. Seilliere had agreed to accept drafts, "upon the security of" like drafts on Invernizio, and that the Invernizio draft was sent to them with a letter stating that the drawers had drawn "against this remittance" in favor of the plaintiffs, but we are not even informed whether they knew that Invernizio was the drawers' debtor. It is certain that they were unwilling to accept drafts on the drawers' credit alone, for their promise to accept was conditional upon having security. An unaccepted draft on a third party would furnish no security, unless the drawee was the drawers' debtor, and then only in case it was the drawers' intention to transfer, or create a charge or lien upon the debt. It is fairly to be inferred, therefore, that in agreeing to accept the Invernizio draft as security the payees understood either that he was obligated to accept it, or that he had funds in his possession belonging to the drawers. Indeed, it might almost be assumed as a matter of course from the form of the transaction that it was but a means to enable the drawers of the two drafts to transfer or realize upon a credit which they had with the ultimate drawee, Invernizio. However, we are dealing with what appear to be ordinary negotiable bills, and I doubt whether the fact that the drawees of one draft stipulated for security in the form of another draft on a third person is alone sufficient to justify the conclusion as a matter of law that the parties intended the latter to operate to transfer, or create a lien or

charge upon, a particular fund. So far then as this submitted controversy is concerned, the plaintiffs must rely on their own equities.

Viewing the matter, then, in the light of the knowledge which the plaintiffs had when they purchased the Paris draft, the case is simply this: Invernizio in Tortona, Italy, was indebted to Scholtz, Sanchez & Co. in New York in at least the sum of $7,000 on open account. The latter wished to convert that credit into money. They had an arrangement with a firm in Paris to accept their drafts secured by drafts on Invernizio, and they procured the plaintiffs to advance them the money on the promise of the Paris firm and on their promise to furnish the required draft on their debtor. More briefly stated, the plaintiffs purchased a draft to be secured by a draft on the drawers' debtor. Plainly they were entitled to that security, and I think their equities in it are to be determined according to the intention and understanding of the parties to the contract of purchase and sale, of which the stipulation to give security was a part. The fact that plaintiffs had other security—i. e., the conditional promise of the Paris firm—does not deprive them of the right to look to the ultimate security for reimbursement; i. e., the debt of Invernizio. Instead of selling the Invernizio draft directly to the plaintiffs, a draft on an intermediary, secured by the Invernizio draft, was employed. Thus the plaintiffs had added security in the form of that intermediary's promise to accept. Still the real purpose of the transaction was to enable the drawers to realize upon the ultimate security Invernizio's debt. The intermediaries having failed to perform their promise, I think we may lay them altogether out of the case and treat the draft on Invernizio as though it had in the first instance been made to the plaintiffs, the only persons who parted with money on the faith of it. Of course, if the plaintiffs had purchased on the credit of the drawers, as is the case of the ordinary mercantile transaction of the purchase of an unaccepted negotiable bill, they would have to stand on an equality with other creditors of the drawers. But the stipulated facts preclude that hypothesis. Security was to be given. A draft was to be drawn upon a drawee, who, the plaintiffs were informed, was indebted to the drawers. By treating that unaccepted draft as security, the parties, in legal effect, said that it was intended to transfer, or create a lien, or charge upon, the drawee's debt.

It is wholly immaterial that the draft was never presented to or accepted by Invernizio. This is not a suit on the draft. We are only concerned with the rules of the Law Merchant to the extent of determining whether they can operate to deprive the plaintiffs of their plain equities. The question before us is whether the plaintiffs or Scholtz, Sanchez & Co., in whose shoes the defendant stands, shall have the funds which Invernizio has turned over. Somewhat differently stated, the question is whether Scholtz, Sanchez & Co., having obtained the plaintiff's money on the faith of Invernizio's debt to them, shall now be permitted to collect the debt. To put the case in a plainer light, suppose, instead of making an assignment for the benefit of creditors, Scholtz, Sanchez & Co. had in some way obtained payment from Invernizio before the draft on him was presented, with the result that, when it was presented, he refused to accept it. Plainly

that would have been a breach of the implied obligation assumed by them when they obtained the plaintiffs' money in part at least on the faith of Invernizio's indebtedness to them. Indeed, such conduct might well be characterized by a harsher term. Can there be any doubt that in such a case equity would treat them as trustees for the plaintiffs? I am unable to perceive how their assignee, who has obtained the money subject to the plaintiffs' equities, is in any better position.

It is unnecessary to go so far as to decide that the draft operated as an equitable assignment, and the cases which have arisen between payee and drawees are not in point. Indeed, I think that the parties could have agreed that the debt of the drawee should be treated as security without in any way interfering with the negotiability of the bill. If they intended that Invernizio's debt should be a security for the ultimate payment of the draft, equity, as between the parties or volunteers, can give effect to that intention by creating a lien or charge upon the debt, if not by raising a trust out of the circumstances of the case. The only hesitation I have is as to whether we can say from the agreed facts as matter of law that such was the intention of the parties. In Throop Grain Gleaner Company v. Smith, 110 N. Y. 83, 17 N. E. 671, the court held as matter of law that the surrounding circumstances showed an intention of the parties that the drafts drawn by a creditor on its debtor should operate to transfer the debt to the payee, and in Fourth Street National Bank v. Yardley, 165 U. S. 634, 17 Sup. Ct. 439, 41 L. Ed. 855, the court from stated facts deduced as matter of law an intention of the parties to transfer pro tanto to the payee of a check a fund consisting of cash and collection items in the hands of the drawee bank belonging to the drawer. In that case Mr. Justice White reviewed the authorities bearing on the application of equitable doctrines in such cases. As I read his opinion, the controlling consideration was that the payee had parted with its money on the security of the fund in the hands of the drawee. To be sure, it was expressly stated in that case, as it is not stated in this, that the plaintiff relied upon the representations made with respect to the fund in the hands of the drawee. However, it is expressly stated that the written promise of Demachy & F. Seilliere was shown the plaintiffs "to induce" them to purchase the draft. The necessary conclusion, then, is that they did not purchase on the credit of the drawers. They were "informed" by the drawers that the latter "would secure the draft" by one on Invernizio. That statement necessarily implied an agreement, by which, as a part of the contract of purchase and sale of the first draft, the drawers were thus to "secure" it. The parties, therefore, expressly referred to the Invernizio draft as security for the payment of the other. It could not before acceptance add any security whatever, unless it was intended by it to transfer or create a lien or charge upon a fund of the drawers in the hands of the drawee. The plaintiffs were informed that the drawee was indebted to the drawer in the amount of the draft, and thereupon agreed to purchase the draft thus secured. It seems to me that they are entitled to look to the security thus expressly stipulated for, not to a piece of paper, which added nothing to the obli-

gations of the drawers, but to the fund which gave that piece of paper the characteristics of a security.

·The plaintiffs should have judgment in accordance with the terms of the stipulation.

INGRAHAM, P. J., and McLAUGHLIN, J., concur.

DOWLING, J. (dissenting). The agreed statement of facts upon which this controversy was submitted contains no recital that Muller, Schall & Co. relied upon the promise of Demachy & F. Seilliere to accept the drafts of Scholtz, Sanchez & Co. upon them up to the limit of 250,000 francs, upon the security of drafts drawn by Scholtz, Sanchez & Co. upon Guiseppe Invernizio to be furnished therewith, nor does it appear that the plaintiffs were induced to purchase the drafts in question upon the faith of any such promise, or that such promise was a valid and subsisting one when shown to plaintiffs. Their letter is not in the record, nor, in fact, is there any document signed by them before us from which we can determine either the extent to which they were bound, if at all, or their reasons for refusing to fulfill their promise. Upon the facts stipulated, all that is apparent is that plaintiffs bought the draft in suit from defendants' assignors, knowing of a promise made to the latter by the drawees that they would accept the draft if accompanied by a draft to a like amount upon a debtor of the assignors. There was no privity between plaintiffs and Demachy & F. Seilliere. The security of the Invernizio draft was not for plaintiffs' benefit, but for that of Demachy & F. Seilliere, to indemnify them for their acceptance by a good draft upon a third party. Plaintiffs never were promised the Invernizio draft as security to them. They parted with their money, not even relying upon the promise of Demachy. & F. Seilliere to accept the draft thus bought. If Demachy & F. Seilliere accepted the draft, though under no legal obligation to do so, plaintiffs had obtained all they were promised. When Demachy & F. Seilliere refused to accept the draft, being under no apparent legal obligation so to do, and returned the Invernizio draft to defendant, the eventuality for which the latter draft had been given had failed and the Invernizio account remained the property of the assignor, as if no draft thereon ·had ever been drawn. The transaction then remained one of the simple purchase of a negotiable bill of exchange, drawn on the general credit of the drawer, which could not operate as an assignment of any particular account or fund.

Nor can plaintiffs find relief under the provisions of Negotiable Instruments Law (Consol. Laws 1909, c. 38) § 223, because thereunder the promise in writing to accept a bill before it is drawn must be unconditional before it can be deemed an actual acceptance in favor of every person, who upon the faith thereof received the bill for value. Here the promise was not unconditional, but by its very terms conditional, and it does not appear that plaintiffs received the bill upon the faith of the promise.

It would seem, therefore, that judgment should be given in favor of defendant, with costs.

LAUGHLIN, J., concurs.