PAYNE BROS. v. LLOYD T. BURNETT et al.*

(*Knoxville*. September Term, 1924.)

1. BANKS AND BANKING. Evidence held sufficient to show bank authorized poultry buyers to check for poultry against drafts on commission dealer to whom poultry shipped.

Evidence *held* sufficient to show that bank authorized poultry buyers to draw checks in payment for poultry and to turn over to bank drafts on commission merchant to whom poultry was shipped, which drafts were to be credited to poultry buyers' account out of which checks were to be paid, and that checks were given to plaintiffs under such agreement of which bank's cashier had knowledge. (*Post, pp.* 498-523.)

Acts cited and construed: Acts 1899, ch. 94.

Cases cited and approved: Falls City State Bank v. Wehrli, 68 Neb., 75; Paige v. Springfield Nat. Bank, 12 Ohio App., 196; Hitt Fireworks Co. v. Scandinavian American Bank, 114 Wash., 167; So. Exchange Bank v. Pope, 152 Ga., 162; Goeken v. Bank of Palmer, 104 Kan., 370; York v. Farmers' Bank, 105 Mo. App., 127; Pile v. Bank of Flemington, 187 Mo. App., 61; Ballard v. Home Nat. Bank, 91 Kan., 91; People's Nat. Bank v. Swift, 134 Tenn., 175; Bank v. Yardley, 165 U. S., 634.

Cases cited and distinguished: First Nat. Bank v. Barger, 115 S. W., 726; Morton v. Woolery et al., 48 N. D., 1132; Johnson-Brinkman Comm. Co. v. Central Bank of Kansas City, 116 Mo., 558; Bank v. Yardley, 165 U. S.. 634.

---

*On right of bank to apply special deposit to an indebtedness of a depositor, see notes in 30 L. R. A. (N. S.), 517, L. R. A, 1918A., 80.

On right of bank to divert deposit for purpose of meeting certain checks or classes of checks, to other purposes, see note in 24 A. L. R., 1111.

2. **BANKS AND BANKING.** Bank authorizing poultry buyers to check against it for poultry against drafts to be turned over to bank held liable to payees of checks.

Where bank authorized poulty buyers to check on bank for poultry, buyers' drafts on commission merchants to whom poultry was shipped to be turned over to bank in settlement of checks, proceeds of drafts were impressed with trust in favor of payees of checks, and bank could not refuse payment of checks and apply proceeds of drafts to buyers' indebtedness to it. (*Post pp.* 523, 524.)

FROM JEFFERSON.

Appeal from the Chancery Court of Jefferson County. —Hon. M. H. GAMBLE, Chancellor.

RUFUS M. HICKEY, for Payne Bros.

McCANLESS, TAYLOR & BELL and J. H. BUNDREN, for Mossy Creek Bank and J. H. Clayton.

FRANK PARK, JR., for Lloyd T. Burnett and T. C Burnett.

MR. JUSTICE HALL delivered the opinion of the Court.

The bill in this cause was filed by L. G. Payne and R. W. Payne, partners in trade, and doing business under the firm name of Payne Bros., and who will be hereinafter referred to as complainants, against Lloyd T. Burnett, T. C. Burnett, J. H. Clayton and Mossy Creek Bank of Jefferson City, Tenn., to recover upon two checks given in payment for a carload of produce, consisting of turkeys, chickens, geese, and eggs sold to Lloyd T. Burnett and his father, T. C. Burnett, on November 23, 1922, for

which Lloyd T. Burnett, through his father, executed and delivered to complainants two checks, one for $4,000 and the other for $2,634.57, drawn on defendant Mossy Creek Bank, which said checks were duly presented to said bank for payment, and were dishonored and payment refused.

The checks were first presented to defendant bank on November 28, 1922, at which time they were returned unpaid, but were again returned to said bank on December 5, 1922, at which time payment was again refused, and said checks were protested.

Upon the hearing the chancellor rendered a joint decree against T. C. Burnett and the Mossy Creek Bank for the amount of the two checks above mentioned, and interest on said sum from December 1, 1922, amounting to the sum of $703.16, in all the sum of $7,337.83, and the costs of the cause. He dismissed the bill as to defendant J. H. Clayton.

Lloyd T. Burnett, at the time of the transaction in question, was a minor, and his plea of infancy was by the chancellor sustained, and the bill was also dismissed as to him.

From the decree of the chancellor the Mossy Creek Bank alone has appealed, and will hereinafter be referred to in this opinion as appellant.

The evidence shows that T. C. Burnett, who is the father of Lloyd T. Burnett, had, up until the late fall of 1921, been engaged in the produce business at Jefferson City, Tenn., and in the vicinity where appellant was located, and carried his account with appellant, but in the late fall of 1921, he became insolvent and was

placed in the hands of a receiver in an insolvent proceeding instituted against him.

Shortly thereafter, T. C. Burnett opened up an account with appellant in the name of his minor son, Lloyd T. Burnett. The evidence shows that the father, T. C. Burnett, had control of the bank account with appellant and the business of his son, Lloyd T. Burnett, and began buying poultry and other produce from local merchants and dealers throughout the territory adjacent to Jefferson City, drawing checks therefor in the name of his son upon appellant, and would draw drafts on the commission merchants to whom such poultry or produce was shipped in New York, and other eastern cities, for the estimated value of same, and, after securing a bill of lading therefor he would deliver said drafts, with bills of lading attached, to appellant, who would take them as cash and credit Lloyd T. Burnett's account with them, and the checks, which Lloyd T. Burnett had drawn on appellant to pay for said poultry or produce, would be paid by appellant from the proceeds of said drafts.

The evidence shows that the first deposit which Lloyd T. Burnett made with appellant was November 25, 1921, and was in the sum of $400. By December 31st this balance was practically consumed, with only $4.12 to his credit. Then Lloyd T. Burnett borrowed $500 from appellant, giving his mother as surety, and deposited this sum, less a few dollars, with appellant on January 4, 1922. Thus starting with a capital of approximately $500, this minor, without property, and with his father insolvent and in the hands of a receiver, by an arrangement with appellant, had, practically within a year, trans-

acted a volume of business aggregating approximately the sum of $300,000.

It appears from an examination of a copy of Lloyd T. Burnett's account with appellant that during the first few months of his operations he made no overdraft of his account with appellant, but starting with March 15th and until March 23d his account was overdrawn all the way from $101 to $400; on March 29th it was again overdrawn $368; on June 8th it was overdrawn $1,682.73; on June 9th, $3,465.52; on June 10th, $1,368; on June 17th, $599.46; on June 28th, $347.18; on June 30th, $236.81; on July 7th, $2,433; and on July 18th, $2,595.95; and from that date until August the 19th, a period of thirty-one days, his account was overdrawn anywhere from the above amount to $4,800. Not a single day during the period of the thirty-one days did Lloyd T Burnett's account with appellant show a balance, except on July the 24th of $76.29.

Starting with August the 22d to August the 28th, his account was continuously overdrawn—one day as high as $1,411.20. Beginning with September the 8th, and continuing until October the 28th, a period of twenty days, his account with appellant stood overdrawn every day, some days in amounts as high as $2,500; the average overdraft during that period being around $2,000. Beginning with November the 2d, and continuing until November the 9th, his account was overdrawn, and beginning with November the 13th, and continuing until November the 17th, his account was overdrawn one day as high as $1,455.31, and on November the 20th and the 21st his account was overdrawn in excess of $1,000.

On November the 23d his account was overdrawn $1,343.90, and on November the 24th it was overdrawn to the extent of $1,948.43. This overdraft appears on the books of appellant, notwithstanding the fact that on said date it was carrying Lloyd T. Burnett's drafts aggregating $15,000.

We think the foregoing facts constitute convincing, if not indisputable, evidence that appellant had an arrangement with the Burnetts to finance them in their produce purchases, taking their drafts as cash, with the understanding that the Burnetts were to draw checks on appellant in payment of the produce purchased.

T. C. Burnett so testified, and in this statement we think he is corroborated by the overwhelming weight of the evidence appearing in the record; in fact, this arrangement is not seriously controverted by appellant.

J. H. Clayton, appellant's cashier, who was in active charge of appellant's business, does not deny that such a course of dealing existed between appellant and the Burnetts.

It appears that on the afternoon of November 21. 1922, between the hours of five and six o'clock in the afternoon, and before the carload of poultry in question was purchased by T. C. Burnett from complainants on November the 23d, T. C. Burnett went to appellant's banking house in Jefferson City, in company with one Ralph Hamilton, his chauffeur, and informed J. H. Clayton, appellant's cashier, that he was going over on the Cumberland Gap Road, first to La Follette, and then up on the Cumberland Gap Road, and would likely purchase three or four cars of poultry over there. Burnett says that he told Clayton that he had one car bought from the

La Follette Produce Company, and that that company would probably call up about the check, as they had not been buying from it, and that he would likely buy three or four cars over there, and Burnett says that he said to Clayton. "Will you take care of the checks"; that Clayton replied, "Do you think you can make any money on them"; Burnett says he replied, "Yes, I think I can;" that Clayton replied, "Well, we will take care of them."

Burnett was then asked:

"What was said, if anything, in regard to bringing back the bills of lading?

"A. Well, just as we started out he (Clayton) said, 'Be sure and bring the bills of lading.' "

Ralph Hamilton testified in corroboration of the statements made by Burnett. He says that he was with Burnett on this occasion; that Burnett got out of the car and went into the bank, and that he, (Hamilton) waited for him a little while and then stepped into the bank. The witness then testified as follows:

"Well, I went into the bank there, and Mr. Burnett was standing there against the desk signing some drafts, checks, or something; and walked across to Mr. Clayton and handed them to him. There was something said about the drafts—I don't remember just what it was— and Mr. Burnett said, 'You will take care of it, will you?' and Mr. Clayton said, 'Yes,' and Mr. Clayton said to him, 'You be sure and bring the bills of lading to take care of the turkeys or chickens, or whatever it was he was going to buy.'

"Q. Where did Mr. Burnett say he was going, if any place?

"A. He did not say exactly where, but to New Tazewell, or somewhere to buy some produce.

"Q. Do you know how many cars he said he would likely buy?

"A. Two or three.

"Q. Was anything said in this conversation about the bills of lading?

"A. Mr. Clayton said, 'Bring the bills of lading back for the cars.' "

Clayton admits that Burnett came into the bank after banking hours between five and 5:30 o'clock on the afternoon of November the 21st, and that Ralph Hamilton was with him. Clayton says that his father, A. A. Clayton, C. E. Edwards, his brother-in-law, and himself were sitting at his desk in the bank. He then testifies as follows:

"Mr. Burnett came in the bank, and it was close to Thanksgiving, and stated that the Thanksgiving market was always good in New York on turkeys and poultry, and that he thought turkeys would bring fifty cents in New York, and that he was going, as I understood him, to La Follette to buy two or three cars of poultry. In his general discussion he stated that he would be back and draw some drafts, so, as usual, I told him when he drew the drafts to have the bills of lading ready."

He was then asked this question on his examination in chief:

"Q. What else was said in that conversation, if anything?

"A. That was practically all that was said to me, in the conversation.

"Q. Mr. Burnett says that in that conversation that he asked you, or told you, that he would likely buy three or four cars over there, and that he said, 'Will you take care of the checks?' and that you made the remark: 'Do you think you can make any money on them?' and that he said, 'Yes, I think I can.' And that you said, 'Well, we will take care of them.' What have you to say in reference to that statement of Mr. Burnett's?

"A. Mr. Burnett never mentioned checks to me; never mentioned who he was buying turkeys from, or whether he was giving any checks. He only stated that he was drawing some drafts, and I asked him to accompany them with the bills of lading.

"Q. Do you, or not, deny that in that conversation you agreed to take care of any checks he might give in the purchase of three or four cars of poultry?

"A. Yes, sir.

"Q. That don't answer my question; I asked you if you admit or deny that that conversation occurred?

"A. I deny that he mentioned checks."

Clayton's brother-in-law, G. E. Edwards, testified with reference to the conversation which took place between Clayton and Burnett on this occasion as follows:

"A. Mr. Burnett came in and told Clayton that he was going to La Follette to buy two or three carloads of turkeys.

"Q. Just continue and tell the balance of the conversation.

"A. And Mr. Clayton told him that if he was to buy turkeys, that he had better have the money there to take care of his checks when they came in.

"Q.   Was anything said in that conversation in reference to bills of lading?

"A.   I think Mr. Clayton told him to bring the bills of lading with him to the bank."

This witness testified as follows on cross-examination:

"Q.   And did Mr. Burnett say that he was going to draw some checks?

"A.   Mr. Burnett said that he was going to La Follette to buy two or three carloads of turkeys.

"Q.   And then what did Clayton say?

"A.   Mr. Clayton told him he had better have the money there to take care of the checks.

"Q.   Is that all that Clayton said?

"A.   I don't know whether that is all he said or not.

"Q.   What did Mr. Burnett say in reply to that statement of Mr. Clayton's?

"A.   I don't remember whether he said anything or not, that I remember."

A. A. Clayton, father of J. H. Clayton, was also offered on behalf of appellant.   His version of the conversation is as follows:

"Well, Mr. Burnett came in, and my son and Mr. Edwards and me was sitting there at the desk talking.  He came in and made a deposit, and I believe that I asked him when I shook hands with him how the poultry business was.  He went on to tell that it was fine.  Then he said to my son, said: 'I am going to La Follette.'  I don't know whether he used the word 'buy,' or 'load out,' or something, three cars of poultry.  My understanding was that it was turkeys, and he spoke of the price of turkeys in New York; I recollect he said fifty cents a pound; I know I thought it was a terrible price.

He said he was going down to load them up and coming back to draw some drafts on him, and my son told him, said: 'Be sure and bring the freight bills if you are going to draw drafts.' That was about the conversation of the poultry business that I heard. I asked the question then about what a car of turkeys would bring, and my recollection is he told me between $4,000 and $5,000. I thought it was a big price, I know.

"Q. Did you hear your son, Mr. J. H Clayton, say to Mr. Burnett, 'Do you think you can make any money on them?' and Burnett replied: 'Yes, I think I can.' He said, 'Well, we will take care of you.'

"A. No, sir; I never heard nothing; don't remember anything of that kind. That, of course, could have happened and me not remember it, but I don't remember it.

"Q. Did Mr. Burnett ask Mr. J. H. Clayton if he would take care of any checks that he might draw on that trip?

"A. No, sir; I don't remember him asking any questions about that.

"Q. Did you hear anything said about any checks in any way?

"A. The only thing I heard said at all, I heard Clayton tell him that if he bought poultry over there, he had better put money here to take care of it, or get money here to take care of that, or something to that effect; that is the only words I heard said about checks. Don't know whether he used the word 'checks,' but that is about what he told him."

It will be noted that both Edwards and A. A. Clayton testified that J. H. Clayton told Burnett that if he were going to buy turkeys he had better have the money

there, or put the money there, to take care of his checks when they came in. J. H. Clayton does not claim that he made any such statement to Burnett. Both Burnett and Hamilton testified that J. H. Clayton did not make any such statement. J. H. Clayton, C. E. Edwards, and A. A. Clayton all agree that J. H. Clayton told Burnett to be·sure and bring the bills of lading to the bank.

Now, we think the foregoing testimony shows beyond dispute that it was expressly understood between Burnett and J. H. Clayton that Burnett would buy two or three cars of poultry at La Folette, and on the Cumberland Gap Road, and that he would draw drafts on the persons or firms to whom this poultry was to be shipped, would secure bills of lading for the cars, and would deliver the drafts and bills of lading to appellant, who would receive them as cash, deposit them to the credit of Lloyd T. Burnett, and would honor the checks of Burnett given in payment for said poultry as it had theretofore done throughout the operations of the Burnetts. We think this is too clear for controversy; in fact, the evidence indisputably shows that this was the only way in which the Burnetts could purchase poultry, and J. H. Clayton, cashier of appellant, well knew this fact. Clayton well knew that the Burnetts were without funds with which to pay for poultry, and could not secure them except under the arrangement above mentioned with appellant.

It further appears that, relying upon this understanding with appellant, T. C. Burnett went over to Lone Mountain in Claiborne county, Tenn., and purchased the car of poultry in question from complainants, and first drew a check in the name of his son, Lloyd T. Burnett,

on appellant in favor of complainants for the sum of $4,000. A check for this sum was given complainants before the poultry had been weighed. On the same day, and within a few hours after the first check was given complainants by Burnett, and after the car of poultry had been weighed and the purchase price definitely ascertained, the second check for $2,634.57, drawn on appellant, was given complainants by Burnett in full satisfaction of the purchase price to be paid for said poultry. The undisputed evidence shows that the sale of the carload of poultry by complainants to the Burnetts was a cash transaction.

T. C. Burnett, pursuant to the understanding had with J. H. Clayton, cashier of appellant, on November the 21st, secured bills of lading for the car of poultry purchased from complainants, and the other cars purchased by them, which cars were consigned to Frank Hillman & Son, commission merchants in New York, and drafts, aggregating $11,000, were drawn on said consignees by T. C. Burnett in favor of Lloyd T. Burnett on November the 25th; the bills of lading were assigned to appellant, and, together with the drafts, were delivered to and accepted by appellant as cash, and Lloyd T. Burnett's account with appellant was credited with their proceeds.

The two checks given complainants were deposited by them in their local bank, Chaiborne County Bank, at Tazewell, on the morning of November the 24th, and were forwarded by that bank in the usual course of business to the First National Bank of Jefferson City for collection. That bank promptly presented said two checks to appellant for payment, and payment of said checks was refused by appellant for the lack of funds. Thereupon,

said two checks were returned to the Claiborne County Bank, who promptly notified complainants that they had been dishonored. Upon learning that payment had been refused by appellant upon said two checks, complainant L. G. Payne called the cashier of appellant, J. H. Clayton, over the phone and talked with him in regard to said checks. He says he called Clayton about eleven o'clock on the morning of the 28th. He then testified as follows:

"I said to him, 'Mr. Clayton, what about the Burnett checks?'" I says, 'I got notice from my brother that they are coming back unpaid?' He said: 'Well, Mr. Payne, it is like this: Mr. Burnett had two cars of turkeys and a carload of chickens, geese, and ducks,' he says, 'and made a draft on us for $11,000, and we didn't feel like going down in our pockets and digging up $11,000 unless we knew those drafts were going to be paid.' 'Well,' I said 'you are taking no chance on this poultry.' I says, 'My car of turkeys will amount to $6,000.' I said, 'They ought to bring more than that.' He said, 'Well, we don't feel like paying this out unless we knew the drafts were going to be paid.' I says, 'You are taking no chance on that.' I says, 'The drafts will be paid.' He says, 'Your car of turkeys amounts to $6,000?' I says 'Yes.' And he said, 'You just let them checks come back in the usual way; if the drafts are paid, I will pay your checks.' That was about all that was said, except he first began by saying that the Burnetts are all right; absolutely all right, but we don't feel like paying this money out without knowing that the drafts would be paid."

L. G. Payne says that immediately after this conversation with J. H. Clayton he telephoned his brother at Tazewell to go to the Claiborne County Bank and have that bank return the checks to appellant. Thereupon R. W. Payne, it appears, did have the Claiborne County Bank return said checks to appellant for payment. It further appears that on the day following the day the checks were returned to appellant by the Claiborne County Bank, L. G. Payne called at the Claiborne County Bank and requested Mr. Hughes, president of that bank, to verify his statement to Hughes that J. H. Clayton had instructed that the checks be returned to appellant and they would be paid.

Mr. Hughes testified that he did call appellant over the phone at the request of complainant, L. G. Payne, and talked with Clayton, and that Clayton instructed him to return the checks in the usual way and that they would be taken care of. Mr. Hughes says that he then told Clayton that the checks had already been returned, and that then Clayton began to talk so low that he (Hughes) could not understand him. Hughes says he then turned the telephone receiver over to G. S. McCullough, one of the bookkeepers in the bank, and McCullough says that he talked with Clayton, and that Clayton told him that the $4,000 check was then good, and that he would not know about the other check until after four o'clock.

J. H. Clayton admits having the conversation with Mr. Hughes over the telephone in regard to said checks, but denies that he instructed Hughes to return the checks in the usual way and that they would be taken care of. He says that he told Hughes that the checks were not

good then, but if he desired he could return them, and if they were good when presented to appellant they would be taken care of. In this statement Clayton is corroborated by one of the young lady bookkeepers in the bank, who claims to have been present and heard the statements made by Clayton to Mr. Hughes in the Claiborne County Bank.

The undisputed evidence shows that appellant collected the drafts, which had been drawn by the Burnetts on Frank Hillman & Son, for the car of poultry purchased of the complainants and shipped to Frank Hillman & Son, and used the proceeds of said drafts in paying certain indebtedness which Lloyd T. Burnett owed appellant, instead of paying the two checks which Lloyd T. Burnett had drawn on appellant in favor of complainants to pay for said poultry, and which checks appellant was bound to know, from its course of dealing with the Burnetts and the Burnetts' course of dealing with those from whom they purchased poultry, had been drawn in favor of complainants on appellant for the poultry purchased.

The bill of complainants sought to recover of appellant the amount of said two checks on the following theories:

(1) On the theory that Lloyd T. Burnett, the drawer of said two checks, had an agreement or understanding with appellant by which appellant agreed to honor checks drawn by him covering the purchase of poultry or produce, and that Burnett was in turn to assign the bills of lading and drafts drawn on the purchaser of this produce in New York, and other eastern cities, to which such produce was shipped, and in accordance with this agree-

ment or understanding the said Lloyd T. Burnett, by and with the consent of appellant, and with its knowledge, represented to different persons, including complainants, that he had such an arrangement with appellant, and that the checks drawn by him on appellant to pay for poultry would be honored by appellant.

(2) That the bills of lading and drafts drawn on the consignees, covering the particular shipment purchased from complainants, were assigned to appellant, and appellant knew that checks had been given complainants in payment thereof, and therefore appellant, under its arrangement with the said Lloyd T. Burnett and his father, T. C. Burnett, in view of its knowledge that the produce for which said checks were given was obtained on the face of said checks drawn on appellant, could not apply the proceeds of said drafts to an indebtedness which Lloyd T. Burnett owed it, and refuse to pay the checks which had been given complainants by Lloyd T. Burnett in the purchase of said poultry; and that appellant was estopped to deny its liability.

The original bill was amended so as to aver as follows:

(1) That on the date when complainants had their conversation over the telephone with appellant, in which conversation appellant expressly agreed to honor the two checks held by them if the drafts drawn on Frank Hillman & Son were paid, said drafts had not, in fact, been paid by the consignees, Frank Hillman & Son, and that if appellant had not expressly agreed to pay said checks complainants could and would have wired Frank Hillman & Son and stopped payment on the drafts which had been drawn upon them, and would have taken the neces-

sary steps to impound the shipment, or the proceeds thereof; and for this further reason appellant was estopped to deny its liability on said checks, it appearing that said drafts were, in fact, paid by Frank Hillman & Son.

(2) That appellant knew that the poultry purchased from complainants was obtained on the faith of the checks drawn by Lloyd T. Burnett on it, and that appellant received the bills of lading covering said shipment, including the drafts drawn on Frank Hillman & Son, obtained the proceeds thereof, and applied them to the payment of Burnett's indebtedness to appellant; that appellant, in the matters aforesaid, and under its arrangement and understanding with the Burnetts, applied the proceeds of said drafts to its indebtedness against Lloyd T. Burnett.

Appellant's answer denied every material allegation of the bill, and set up the plea of the statute of frauds.

By its assignments of error appellant insists:

(1) That the chancellor committed error in rendering a decree against it in complainants' favor, and in failing and refusing to dismiss complainants' bill as to appellant because said decree is not sustained by a preponderance of the evidence.

(2) That the chancellor committed error in rendering a decree against appellant and in favor of complainants, and in refusing to dismiss complainants' bill because, as a matter of law, appellant was not liable to complainants under the facts averred in the bill.

(3) That the promise on the part of appellant to pay the checks in question, as averred in complainants' bill, was merely the oral promise to pay the debt, default, or

miscarriage of another person, to-wit, Lloyd T. Burnett, and therefore defendant would not be liable in view. of its special plea of the statute of fraud.

After a careful examination of the record, we are of the opinion that the decree of the chancellor against appellant was authorized by both the law and the facts.

In *First National Bank* v. *Barger* (Ky ), 115 S. W., 726, after stating that a bank which receives a general deposit from one who is indebted to it has the right to charge the depositor's account with such indebtedness, states it to be the law that—"If the bank receives a deposit with notice that it is made for the purpose of meeting outstanding checks drawn by the depositor, it has no right to charge the depositor's account with sums due it by the depositor, and thus defeat the person holding the outstanding claims from collecting their checks."

The court added that this rule applies only when the bank has notice of the previous appropriation of the sum deposited; or, in other words, that it is a special deposit to meet outstanding checks issued by the depositor.

In *Falls City State Bank* v. *Wehrli,* 68 Neb., 75, 93 N. W., 994, a bank which had an agreement with a horse buyer that he might check on the bank in payment for a carload of horses, and, upon shipment, turn in a draft and bill of lading in settlement for the checks, was held liable to the holder of the check given in the purchase of a horse, where it had received the proceeds of the draft and refused to cash any more checks, applying the remaining proceeds of the draft to the payment of claims which it held against the horse buyer.

The court stated that the agreement between the bank and the horse buyer that he might check was equivalent

to putting the amount of money necessary to purchase the carload of horses to the horse buyer's credit for that purpose, and until it was drawn out for that purpose, or the horses otherwise paid for, it would be there.

In *Paige* v. *Springfield National Bank,* 12 Ohio App., 196, it was held that a bank which had agreed with a hay dealer to pay checks given by him on a promise that he would make deposits during the day to cover holds the funds so deposited for the purpose of paying the checks, and money so deposited cannot be properly used by the bank in the payment of another check not included in those specifically mentioned.

In *Hitt Fireworks Co.* v. *Scandinavian American Bank,* 114 Wash., 167, 195 P., 13, 196 P., 629, it was held that a bank in which money was deposited for the purpose of paying checks which had been drawn by the depositor was held not entitled to credit for such deposit upon another obligation of the depositor.

In *Southern Exchange Bank* v. *Pope,* 152 Ga., 162, 108 S. E., 551, it was held that a bank with which a check was deposited for the purpose of paying a draft drawn upon it by another bank, and which collected the check, but applied the proceeds to the payment of other claims held against the bank which drew the draft, was liable for such misappropriation. The court stated that it is the duty of the bank which has accepted from a depositor a specific deposit, or one for a particular designated purpose, to use the deposit for that purpose and no other, and the least turning aside by the bank of the fund thus acquired is legally a wrongful act, and subjects any person who knowingly aids in such diversion to full responsibility.

The general right of the holder of a check to sue the bank was sustained in some jurisdictions prior to the Negotiable Instruments Act (Laws 1899, chapter 94). See *Falls City State Bank* v. *Wehrli,* supra. And since the adoption of the act, notwithstanding its provisions that a check does not operate as an assignment, and that the bank is not liable to the holder unless and until it accepts or certifies the same, an action by the holder of the check for the payment of which funds have specifically been deposited has been sustained. Some of these cases proceed on the theory that there has been an acceptance, or acts equivalent thereto; others have no very clear theory.

It has been held that the holder of a check given upon a purchase of live stock might recover of the drawee bank, which had agreed with the purchaser that he might purchase live stock, give his checks on the bank of the sellers, and deposit the proceeds of resale in the bank, which, out of the funds so derived, would pay the checks and the expenses incident to the transaction; it appearing that the funds derived from the resale, which were deposited in the bank, were sufficient for the payment of the checks. *Goeken* v. *Bank of Palmer,* 104 Kan., 370, 179 P., 321.

It is stated by the court that, although the holder of the check was not a party to the agreement between the purchaser of the live stock and the bank, the agreement was made in part for his benefit, and he was entitled to avail himself of the promise of the bank, although he may not have known that it was made.

The question was raised in this case as to the proof of the existence or nonexistence of the funds. The court

held that, the holder of the check having produced proof which traced the funds derived from the sale of the stock into the bank, it devolved on the bank to show that there were no funds with which to pay the check given for the stock in pursuance of the agreement; the bank having failed to do this, the defense of the bank failed.

Where, by a course of dealings between a bank and a live stock dealer, the bank paid his checks given in the purchase of stock, and when a carload of stock was ready for shipment a draft was drawn upon the consignee and the bank reimbursed out of the proceeds, the holder of checks given by such dealer may recover on the same from the bank; it appearing that it had received the aggregate of all checks given by the dealer for the purchase price of the car in question. *York* v. *Farmers' Bank,* 105 Mo. App. 127, 79 S. W., 968.

The court stated it to be true that the dealer was not suing on the contract and arrangement in issue, but it held that the plaintiff was sufficiently in privity with him to enforce the liability of the bank resulting from such contract and arrangement.

In *Pile* v. *Bank of Flemington,* 187 Mo. App., 61, 173 S. W., 50, it was held that a bank which received the proceeds of a carload of cattle, knowing it to be such proceeds, and knowing, also, that the cattle sold by the holder of a check were included therein, was held liable to such holder, on the theory that, having received money belonging to such holder, with knowledge at the time that it was his money, and having refused to pay it over on demand, such holder was entitled to maintain an action against it for money had and received, and to re-

cover to the extent of the amount so received and not paid over.

In *Morton* v. *Woolery et al.*, 48 N. D., 1132, 189 N. W., 232, 24 A. L. R., 1107, it appears that Woolery was a cattle buyer and carried on his business with defendant bank by having what was known as a cattle account. In September, 1920, his account was overdrawn as a result of losses in the cattle business, and in October, 1920, he purchased from plaintiff twenty head of cattle, giving his check for $620, which check was drawn on defendant bank. According to the testimony of the assistant cashier of defendant bank, Woolery came to defendant bank prior to October 21, 1920, and asked the assistant cashier if the bank would honor his checks to be issued in payment of a carload of cattle, and he informed the bank's assistant cashier that he would draw and deposit a sight draft for $1,600 on the company to whom the cattle were consigned, and the assistant cashier agreed with Woolery to honor the check. Thereafter the sight draft was drawn and deposited to Woolery's account, after which the bank honored certain checks of Woolery which were outstanding, and when plaintiff's check came in for payment it was dishonored because of lack of funds. The bank contended that the deposit of the $1,600 draft was a general one, and that the bank had the right to pay checks drawn against the account, even though the checks were old ones. This contention of defendant was overruled, the court finding that the bank knew that the old checks were not drawn in the payment of any cattle included in the shipment designated by Woolery at the time he deposited the $1,600. The court held in this case that the deposit of this money was in effect im-

pressed with a trust in favor of plaintiff, and those from whom the defendant Woolery had purchased the cattle, and in payment of which he had drawn his checks on defendant bank.

In that case the court said:

"In support of this contention it is asserted by the defendant bank that the deposit of the $1,600 was a general one, and that the bank was entirely within its rights, and properly performed its duties, when it paid checks as presented, even thought such checks were old ones which had been drawn and presented for payment, and payment of which had been refused by the bank long prior to October 21, 1921.

"In our opinion the contention cannot be sustained. We believe there is abundant evidence tending to sustain a finding that the $1,600 draft was deposited for a special purpose, namely, the payment of checks to be thereafter drawn by Woolery in favor of the various parties from whom he would purchase cattle for that particular shipment. The bank knew that Woolery would purchase cattle for such shipment, and draw checks upon the 'cattle account' in payment of cattle so purchased. It was informed that the amount of checks to be drawn would be not less than $1,600, might run something over that, but would not exceed $1,700. The bank knew that the old checks were not drawn in payment of any cattle included in the shipment designated by Woolery at the time he deposited the $1,600 draft. It knew that those checks had been issued long prior thereto, and had been issued for other purposes. And, when the bank honored such old checks, it must have known that it was not likely that all checks drawn by Woolery in payment of the

cattle included in the carload against which the sight draft was drawn had been presented.''

To the same effect is the holding of the court in *Johnson-Brinkman Commission Co.* v. *Central Bank of Kansas City,* 116 Mo., 558, 22 S. W., 813, 38 Am. St. Rep., 615.

In that case the court said: ''It makes no difference that Imboden Commission Co. was indebted to defendant at the time of the transaction and prior thereto; it could not apply the funds that in legal contemplation belonged to another party to the payment of its debts, without its knowledge or consent. The evidence shows very conclusively that defendant knew all about the business transactions of Imboden Commission Co., as all payments for grain purchased by it, as well also as all collections received on sales of grain sold by it, were made through defendant bank. The conclusion is irresistible that it knew all about the manner and mode of the purchase of grain by the Imboden Commission Co. and that the wheat in controversy when bought by it, was bought for cash, and that it had not been paid for.''

To the same effect is the holding of the court in *Ballard* v. *Home National Bank,* 91 Kan., 91, 136 P., 935, L. R. A., 1916C, 161.

*People's National Bank* v. *Swift,* 134 Tenn., 175, 183 S. W., 725, is also in point. In this case Nolen purchased from Swift some mules, and drew a check in his favor on defendant bank. Nolen shipped the mules to Atlanta, and drew draft thereon and deposited same in defendant bank; Nolen assuring Swift that his check would be paid out of the proceeds arising from the draft when it was collected. Swift deposited his check in the Bank of

Whitehouse,. with which he did business, and had the cashier of that bank call up Mr. Hitchcock, the cashier of defendant, and the cashier informed Hitchcock of the check which Nolen had given Swift, and Hitchcock stated to the cashier of the Bank of Whitehouse that when the draft was paid he would pay the check. The draft was paid, but the defendant bank, instead of paying the check held by Swift, applied the proceeds of the draft to Nolen's indebtedness to it, and to other purposes, and thereafter suit was brought against the bank by Swift. In disposing of the case this court said:

"We are of the opinion that the plaintiff in error is so indebted [to defendant in error] on two grounds.

"1. The arrangement between Nolen and Swift amounted to an appropriation of a sufficiency of the Atlanta drafts to pay the check in question. It is true that it does not appear that this arrangement was communicated in terms to the plaintiff in error, but the latter agreed, as shown by the statement, that the check should be paid out of these drafts, and we must infer that Nolen had himself communicated to the plaintiff in error what had passed between him and Swift. At all events, since Nolen had agreed and the bank itself had consented to the same arrangement, in its talk with Mr. Corder, over the telephone, it would be estopped to deny the appropriation."

In referring to the Negotiable Instruments Law, the court stated:

"It is true that under section 189 of the Negotiable Instruments Law a check of itself does not operate as an assignment of any part of the fund to the credit of the drawer, and the bank is not liable to the holder, unless

and until it accepts or certifies the check. However, this section does not interfere with an appropriation of the fund by an outside arrangement between the parties which is brought to the attention of the bank before it has paid out the money. That there may be such an appropriation by an outside agreement is shown by the case of *Bank* v. *Yardley,* 165 U. S., 634, 17 Sup. Ct., 439, 41 L. Ed., 855."

In *Bank* v. *Yardley,* supra (165 U. S., 634, 17 S. Ct., 439, 41 L. Ed., 855) it is said:

"Whilst an equitable assignment or lien will not arise against a deposit account solely by reason of a check drawn against the same, yet the authorities establish that if in the transaction connected with the delivery of the check it was the understanding and agreement of the parties that an advance about to be made should be a charge on and be satisfied out of a specified fund, a court of equity will lend its aid to carry such agreement into effect as against the drawer of the check, mere volunteers, and parties charged with notice."

Also in *Ballard* v. *Home National Bank,* supra, the court said:

"The Negotiable Instruments Act provides specifically that a bank is not liable to the holder of an unaccepted check, . . . and that the acceptance must be in writing, . . . and if on a separate paper, operates only in favor of one to whom it is shown. . . . These provisions are declaratory of the law as it already existed. (Citing numerous authorities.) The present actions are not brought simply on the promise of the bank to pay Stewart's checks issued in payment for stock. They are brought upon that promise, supplemented by

the carrying out of the conditions on which it was based —the purchase of the stock, the issuance of the checks, the resale of the stock and the deposit of the proceeds to met the checks—in effect the receiving by the bank of the money appropriated by agreement to that purpose."

We think it clearly appears by a preponderance of the evidence that there was, at least, an implied, if not an express, agreement between the Burnetts and appellant's cashier, J. H. Clayton, which authorized the Burnetts to buy poultry and draw checks in favor of the sellers, including complainants, on appellant for its payment, and then draw drafts on the commission merchants, to whom such poultry was shipped, in favor of Lloyd T. Burnett, who would indorse such drafts to appellant, together with the bills of lading, for the cars of poultry, and that appellant would accept these drafts and credit Lloyd T. Burnett's account with them as cash, and out of the proceeds of said drafts would pay the checks drawn by Lloyd T. Burnett in favor of the sellers of such poultry; that the two checks in question were drawn by T. C. Burnett in the name of his son Lloyd T. Burnett, in favor of complainants pursuant to such an agreement or understanding clearly appears from the proof and that appellant's cashier, J. H. Clayton, knew, at the time that he applied the proceeds of the draft drawn by Lloyd T. Burnett on Frank Hillman & Son, to whom said car of poultry had been consigned, to the payment of indebtedness due from Lloyd T. Burnett to appellant, that said two checks held by complainants were outstanding and had not been paid. Therefore appellant did not have the right to refuse payment of said checks and apply the proceeds of said drafts to the satisfaction of

the indebtedness due it from Burnett; the proof show-
ing that the net proceeds of said car of poultry amounted
to approximately $8,000. We think the true ground of
appellant's liability is that the proceeds of said car of
poultry were impressed with a trust in favor of com-
plainants, from whom Burnett had purchased it, and in
payment for which he had drawn checks on appellant,
pursuant to the agreement or understanding hereinbefore
stated.

There is no error in the decree of the chancellor, and
it will be affirmed, with costs.