168 So. 668

**TOWN OF LA FAYETTE v. WILLIAMS,**
**Superintendent of Banks.**

**5 Div. 214.**

Supreme Court of Alabama.

May 21, 1936.

Rehearing Denied June 11, 1936.

Will O. Walton, of LaFayette, for appellee.

Chas. S. Moon, of LaFayette, and Jacob A. Walker, of Opelika, for appellant.

504

THOMAS, Justice.

The suit is to declare a preference in favor of the municipality against the superintendent of banks and the funds of the suspended bank. The decree was against the municipality.

On February 17, 1933, the municipality drew its check on the bank in the sum of $6,426.04, for the purchase of light, water, and sewer bonds of the town of LaFayette, which, according to an agreement between the owners of the bonds, were to be delivered to the First National Bank of Birmingham, Ala., on February 20, 1933, at which time and place the municipality would pay for the same.

The municipality and its mayor and councilmen were duly authorized to make this purchase. The check drawn for the purpose was as follows:

"Voucher Warrant      No. 8693
"Original
"Town Of LaFayette
"LaFayette, Ala. Feb. 17, 1933
"Pay to the Order of Bank of LaFayette $6,426.04 Six Thousand Four Hundred Twenty-six & 04/100 Dollars
"Payee by endorsement acknowledges receipt in full as per statement below detached by payee
"To the Bank of LaFayette, LaFayette, Alabama
"Town of LaFayette
"By W. R. Chatfield, Clerk
"Charge Elec. Light Fund
"Detach statement here before presenting for payment

"If any difference in settlement return without alteration
"Town of LaFayette No Receipt Desired No–8693
"Settlement ——— 193—
"On the left hand margin was written 'Approved: Sam H. Oliver, Mayor.'
"The entire voucher warrant was marked cancelled and void.
"This Check is issued to the Bank of La-Fayette as an agent of the Town of La-Fayette for the purpose of purchasing $7,-500.00 of bonds outstanding against the said Town, and it is agreed that in accepting this check the said Bank obligates itself to deliver said bonds to Sam H. Oliver, Mayor of the Town of LaFayette, upon receipt of them from the First National Bank of Birmingham, Alabama, to whom they were sent for collection by H. V. Sattley & Co., Incorp. of Detroit, Mich."

The words "cancelled and void" were not indorsed on the check by the mayor, but when given back to him on February 27th, it was then so indorsed.

The evidence shows the bonds were delivered according to contract to the First National Bank of Birmingham; that the Bank of LaFayette did not cash the check, pay for and receive the bonds in question as instructed by the mayor to do, and, having failed and refused to cash the town of LaFayette's check for $6,426.04, returned it to the mayor of the town of La-Fayette on February 27, 1933.

The evidence further shows that on February 25, 1933, the cashier of the Bank of LaFayette approached a member of the council of that municipality and asked him to see the other members of the town council and see if they would agree to vote for a resolution to rescind the former action and invest these funds in school tax warrants issued by the county board of education of Chambers county, keep the money in the state, and not send it abroad. At a meeting of the town council on February 27th, thereafter, the former action authorizing the mayor to purchase $7,500 of the town's light, water, and sewer bonds was rescinded, and the mayor authorized to purchase up to $6,500 of school tax warrants issued by the county board of education of Chambers county. In conformity with this last action of the town of LaFayette and the agreement with the Bank of LaFayette, the town's former check was returned, and the mayor purchased said school tax warrants. The

Bank of LaFayette honored the town's check in purchasing the warrants up to and including $3,500, but failed and refused to honor its further check in keeping with the agreement.

It is further shown by the evidence that on and from the date of February 18, 1933, up to and on the date of February 27, 1933, the town was in funds and well able to fulfill its contract obligation for the purchase of such bonds and school tax warrants.

■ The court takes judicial knowledge of the moratorium and the Governor's Proclamation of March 1, 1933, as affecting banks. King v. Porter, 230 Ala. 112, 160 So. 101; Hamilton et al. v. James, 231 Ala. 668, 166 So. 425.

The conflict in the evidence is whether, if the city authorities were informed that the first check was paid, it would so reduce the bank's cash reserve as to require closing the bank, and whether the bank was instructed not to remit the amount of the check to Birmingham. However this may be, the fact remains that the check of the town of LaFayette, set out above, was returned by the bank on February 27, 1933, when all the time the city was in sufficient funds with that bank to authorize its execution as an agency for the transfer of the bonds from Birmingham.

It is insisted by appellant, that under the evidence showing that only a short time elapsed between the receipt of the trust fund from the appellant by the bank and the final closing of the bank on March 1, 1933, the trust fund doctrine was effective and fastened upon so much of the bank's fund as was identified within the rule of our recent cases and the purchase of school tax warrants. Robinson v. Williams, Supt. of Banks, 229 Ala. 692, 693, 159 So. 239; Screws v. Williams, Supt. of Banks, 230 Ala. 392, 161 So. 453; annotations, 82 A.L.R. 93.

■ It is established by the general authorities, as well as those of the federal courts, that: "No change in the state or form of trust property can devest it of its trust character; a court of equity will follow it through all the transmutations it may undergo in the hands of the trustee bank, and it may be pursued and recovered by the beneficial owner as long as it can be traced or identified, either in its original state or in some altered or substituted form." That is to say, where trust moneys are invested by the trustee bank in other property, personal or real, the property so acquired remains subject to the trust in the hands of the bank or that of its receiver. 82 A.L.R. 87-91; Bank of Florence v. United States Savings & Loan Co. (1894) 104 Ala. 297, 16 So. 110; St. Louis Brewing Association v. Austin, Receiver, etc. (1893) 100 Ala. 313, 13 So. 908.

It is further declared that the fact that only a short time elapsed between the receipt of the trust fund by the bank and the final closing of the bank because of insolvency, reduces the probability "that the fund has been paid out or dissipated by the bank." 82 A.L.R. 93.

In the instant case, were there matters of book entries or shifting of credits shown by the evidence which divested the fund of its trust character, if it were so impressed?

It has been declared in some jurisdictions, as follows:

"The mere entry or shifting of credits on the books of a bank, though involving a trust fund, does not entitle the cestui que trust to a preference with respect to the assets of the bank in the hands of its receiver, where it is not shown that the funds coming into the hands of the receiver have been augmented or benefited by the trust fund. * * *

"A mere shifting of credit on the books of an insolvent bank, by crediting one account and debiting another, without the actual receipt of any money by the bank, or the segregation of the amount credited from the general mass of the funds of the bank, does not sufficiently identify a trust fund to permit of its being followed into the assets in the hands of the bank's receiver. Mechanics & M. Nat. Bank v. Buchanan (1926; C.C.A. 8th) 12 F.(2d) 891 (writ of certiorari denied in (1926) 273 U.S. 715, 47 S. Ct. 108, 71 L.Ed. 855).

"The court in Bellevue State Bank v. Coffin (1912) 22 Idaho, 210, 125 P. 816, announced the rule as follows: 'If the transaction results in nothing more than an exchange of creditors or the mere cancelation of one liability and the assumption of another, * * * such facts alone are not sufficient to show that the assets of the trustee or its assignee have been increased by such transaction, and therefore there has been no betterment of the estate and such assets have not been improved or rendered

more valuable and are in no way impressed with the trust.'" 82 A.L.R. at page 95.

On the other hand, it is declared as the majority rule that, "where an insolvent bank receives a deposit of trust funds consisting of checks or drafts drawn on itself, and merely charges the amount thereof to the accounts of the obligors in such bank, or effects a collection of paper held by it for collection *and remittance by means of checks drawn upon itself, or merely by charging the amount of such paper to the account of the obligor in such bank*, where no money changes hands in the transaction. * * * The courts have taken the view that such a transaction results in an augmentation of the assets of the bank coming into the hands of its receiver, entitling the beneficial owner of the trust fund to a preference or charge with respect to such assets, where there is a sufficient balance to the credit of the obligor in the bank to cover the amount of the charge against his account, and the bank has on hand cash equal to or exceeding the same." (Italics supplied.) 82 A.L.R. 97.

The latter rule obtains in the later federal decisions and those of the states of Arkansas, Florida, Illinois, Iowa, Kansas, Minnesota, Missouri, Montana, Oklahoma, Oregon, Utah, Wisconsin, and Wyoming.

"In Kansas Flour Mills Co. v. New State Bank, 124 Okl. 185, 256 P. 43, where an insolvent bank received for collection and remittance only a draft drawn upon one of its depositors, on the express condition that the item was not to be treated as a deposit and that the proceeds were not to be commingled with the other funds of the collecting bank, and the collection was effected by a check drawn on the collecting bank and charged to the depositor's account at a time when the depositor had a sufficient balance to pay the check and the bank had on hand sufficient cash to cover the same, the court overruled the contention of the commissioner in charge of the affairs of the bank to the effect that there was no augmentation of the cash of the bank, but merely a shifting of credits, and held that the intention of the parties, expressed in writing, could not be 'defeated by the alchemy of bookkeeping or methods of doing business in the bank,' stating: 'We therefore indulge the presumption that the bank did right; that by the substance and the very essence of the transaction, this fund must be deemed to have been segregated upon taking the amount thereof out of the account of Adams

& Crump, though not so showing on the books of the bank, and that three days later, when the bank commissioner took charge of the bank, the sum of $913.34 of the assets was a special trust fund belonging to the plaintiff. If this be true, of course the assets in his hands were thereby augmented and this fund is traceable, the transaction being the same as if the bank had received the cash instead of the check for collection.'

"To the same effect is First State Bank v. O'Bannon (1928) 130 Okl. 206, 266 P. 472." 82 A.L.R. pp. 97–100, and many authorities collected.

This is the majority rule. Lane v. First National Bank of Vale et al., 131 Or. 350, 270 P. 476, 281 P. 172, 283 P. 17; Goodyear Tire & Rubber Company v. Hanover State Bank et al., 109 Kan. 772, 204 P. 992; 21 A.L.R. 677; State National Bank of Little Rock v. First National Bank of Atchison, Kansas, 124 Ark. 531, 187 S.W. 673; Messenger v. Carroll Trust & Sav. Bank, 193 Iowa, 608, 187 N.W. 545; Andrew, State Supt. of Banking, v. State Bank of Dexter, 204 Iowa, 565, 215 N.W. 742; Leach, State Supt. of Banking, v. Farmers' Savings Bank of Hamburg et al., 204 Iowa, 1083, 216 N.W. 748, 65 A.L.R. 679; Vermont Loan & Trust Co. v. First National Bank of Cheyenne et al., 37 Wyo. 216, 260 P. 534; Winkler et al. v. A. J. Veigel, 176 Minn. 384, 223 N.W. 622.

The minority view, "that the deposit of checks or drafts drawn on the trustee bank itself, or the collection of paper held by the bank for collection and remittance by means of a check or draft drawn on the collecting bank, or by merely charging the account of the obligor in such bank, is a mere shifting of credits or liability, not augmenting the assets of the bank coming into the hands of its receiver," and hence that such fund cannot be followed by the beneficial owner into the assets in the receiver's hands, is given expression in federal District and Circuit Courts, and decisions in Idaho, New Jersey, North Carolina, Pennsylvania, South Carolina, and South Dakota.

The authorities are likewise collected in 82 A.L.R. at pages 108 to 112, to the effect that a check on or other appropriation or segregation of existing general deposit for trust purposes, held to amount to an augmentation of the assets coming into the hands of the bank's receiver upon its insolvency, so as to entitle the owner to follow the trust fund in such assets. Davis v. McNair (C.C.A.) 48 F.(2d) 494; Schu-

macher v. Brinson (C.C.A.) 52 F.(2d) 821; Northwest Lumber Company v. Scandinavian American Bank of Scattle, 130 Wash. 33, 225 P. 825, 39 A.L.R. 922; Johnson v. Farmers' Bank of Clarksdale, 223 Mo.App. 513, 11 S.W.(2d) 1090; Bryan v. Coconut Grove Bank & Trust Co., 101 Fla. 947, 132 So. 481, 134 So. 229; City Bank of Ft. Lauderdale et al. v. Hart, 102 Fla. 529, 136 So. 446; Howland v. People of the State of Illinois ex rel. Russell, etc., 229 Ill.App. 23.

We have noted that on January 19, 1933, the town of LaFayette had arranged to make a discount purchase of its outstanding bonds, and duly authorized its mayor by resolution of date of February 17, 1933, to so purchase with its warrant or check on the Bank of LaFayette; that on February 18th, the mayor, within banking hours, presented the town's check to the bank official, explaining that the amount of money evidenced by that check was required to be transmitted to the First National of Birmingham where the bonds were to be delivered on February 20, 1933. That check recited the fact of its issue to the Bank of LaFayette as its agent to effectuate the purchase and receive delivery of $7,500 of the town's light, water, and sewer bonds, and it remained in the possession of the Bank of LaFayette until the morning of February 28, 1933, without remittance being made to Birmingham. The mayor testified that it was received by the bank without condition or protest, with the indication that its written instructions would be observed and the agency imposed carried out. The executive or vice president of the bank testified to a conversation between Mr. Oliver and Mr. Winter, wherein the latter was told to look up his balances before remitting, and that in the course of that conversation the remittance was refused as being violative of the rule which requires the maintenance of 15 per cent. of the deposits as a balance or reserve.

The bank officials so testifying are not positive when this conversation occurred, saying that it was their impression it occurred when the check was "handed in." The testimony of Oliver was that such conversation was after presentation and on Saturday February 25th, and not on February 18th, the date of presentment.

The witnesses Oliver and Chatfield testified, that as the city's officials they were given the impression that the money had been sent to Birmingham for the bonds, and did not have contrary information until inquiry by Chatfield, the clerk of the city, was made as to the bonds which were to have been purchased pursuant to former instructions.

The burden was upon the bank (or upon its representative, the superintendent of banks, standing in its stead) to show good faith on the part of Mr. Winter and the bank in behalf of the town of LaFayette in discharge of the obligation undertaken in that behalf; and to further show that there was an absence of improper or undue influence on Winter's part for the bank against the town of LaFayette in the delayed action that occurred. 2 C.J. p. 930; Bull v. Novice State Bank (Tex.Civ.App.) 250 S.W. 232; Commercial State Bank of Fort Worth v. Harkrider-Keith-Cooke Co. (Tex.Civ.App.) 250 S.W. 1069.

As we view the evidence, the burden of proof required of the bank was to explain the retention of the check. As we understand the evidence, sending forward $6,426.04 to the Bank of Birmingham would not have reduced the LaFayette bank's reserve below the required limit.

The dual relation of Winter and Ratchford, the appeal made for the purchase of Chambers county school tax warrants, and the later authorization and purchase of a part thereof on the day before the bank closed its doors per proclamation of the Governor, did not change the trust relation and justify the failure of discharge thereof as to the balance of funds not so employed.

Under the rules of law applicable and the evidence, the check stating the trust was accepted by the bank and the duty of transmission to and consummation of the purchase of the bonds in Birmingham was required. Bryan, as Administratrix, etc., v. Coconut Grove Bank & Trust Co., as Receiver, etc., 101 Fla. 947, 132 So. 481; Id., 101 Fla. 965, 134 So. 229.

Under the authority of the Bryan Case, supra, the trust fund was held for the benefit of the town of LaFayette. In that case the court said:

"The general rule is that every person who receives money to be paid to another, or to be applied to a particular purpose, to which he does not apply it, becomes a trustee, and is answerable to the owner of the money as for a breach of trust. In re Interborough Consol. Corp. (C.C.A.) 288 F. 334, 32 A.L.R. 932, and note; Payne Bros.

v. Burnett, 151 Tenn. 496, 269 S.W. 27, 39 A.L.R. 1125; Morse on Banks & Banking (6th Ed.) § 185.

"Where the depositor, at the time the deposit is made, enters into an agreement with the bank, or the bank receives and accepts the deposit with instructions from the depositor that the money so deposited is for a specific purpose, and for that alone, such deposit partakes of the nature of a special deposit, being sometimes called a 'specific deposit,' and the relation between the depositor and bank with reference to such deposit is that of principal and agent. Title to the deposit remains in the depositor. Under such circumstances, therefore, the relation of debtor and creditor does not exist. Northern Sugar Corp. v. Thompson (C.C.A.) 13 F.(2d) 829; Morton v. Woolery, 48 N.D. 1132, 189 N.W. 232, 24 A.L.R. 1107; Sawyers v. Conner, 114 Miss. 363, 75 So. 131, L.R.A.1918A, 61, Ann.Cas. 1918B, 388; American Bank v. Presnall, 58 Kan. 69, 48 P. 556.

"If the purpose for which a special deposit was accepted by a bank cannot be accomplished, the bank is liable to the depositor for the return of the funds. American Bank v. Loretta Co., 165 Ill. 103, 46 N.E. 202, 56 Am.St.Rep. 233; Mester v. Quincy Bank, 163 Ill.App. 645; Morse on Banks & Banking (6th Ed.) § 208.

"The general test applied to determine whether or not a claimant is entitled to preferential payment from the assets of an insolvent bank in the hands of a receiver is that it must appear that the funds in question were in the bank's possession as agent, bailee, or trustee; that such funds reached the receiver's hands in some form; and that the assets brought under the receiver's control were larger by that amount than they would otherwise have been. In determining the status existing between appellant and the bank itself, the controlling element is the mutual intention and purpose of the parties with respect to the fund." 101 Fla. 947, 957, 958, 132 So. 481, 485, 134 So. 229.

In the note, 82 A.L.R. at page 111, the annotations state the facts of the Bryan Case, supra, and the conclusion as follows: " 'That the funds thus held upon special or specific deposit improperly remained commingled with the general funds belonging to the bank by reason of the failure of the bank's officers to segregate the funds as it was their duty to do, does not defeat appellant's title to such funds merely because there is no way to identify the specific money. The mingling of such specific funds under those circumstances extends the trust to all the funds of the bank.' "

And the Florida court further observes: "The receiver contends that no preference should be allowed appellant because the bank's assets coming into his hands were not increased by the transaction between the bank and appellant. That contention cannot be sustained. On June 8, 1926, the Bank of Coconut Grove *owed* appellant the sum of $14,420 as a general debtor. When on that date appellant drew and delivered the check in question to the drawee bank, and the bank accepted that check as the equivalent of cash under the circumstances stated, the effect of the transaction was the same as if appellant had drawn out the money, and received manual custody of it, afterwards returning it to the bank, sacked, sealed, and labeled, for transmission to New York, and not for general deposit. In contemplation of law the amount represented by the check passed out of the hands of the bank into the hands of appellant in payment of its existing indebtedness to appellant, after which the funds were again returned to the bank for a specific purpose and in a different status, and so remained when the receiver took charge of the bank's assets. Thus the money belonging to appellant must be regarded as having passed into the hands of the receiver, increasing by that amount the assets to be administered by him. Goodyear Tire & Rubber Co. v. Hanover Bank, supra [109 Kan. 772, 204 P. 992, 21 A.L.R. 677]; Bank of Poplar Bluff v. Millspaugh, supra [313 Mo. 412, 281 S.W. 733, 47 A.L.R. 754]." 101 Fla. 947, 963, 964, 132 So. 481, 487, 134 So. 229.

■ That the subsequent action of the city council on February 27, 1933, and the consummation of the purchase of school tax warrants for $3,500 on March 1, 1933, amounted to no more than a subsequent instruction in an effort to acquire what was available of the trust fund from the bank in its then condition, is the argument of appellant. We are, however, of the opinion, assuming that the trust relation was created under the first resolution of the city and the check issued thereunder and delivered to the bank, that the effect of the last resolution of February 27, 1933, was a rescission of the preferential right of payment, if such was the case, and this solemn action was binding upon the town of LaFayette. It results from this view that the decree.

of the trial court is free from reversible error, and it is affirmed.

Affirmed.

ANDERSON, C. J., and KNIGHT, J., concur.

BROWN, J., limits his concurrence to the result only.